## IN THE MATTER OF MARY HIER.

Essex. May 30, 1984. — June 4, 1984.

Present: GREANEY, C.J., ARMSTRONG, & WARNER, JJ.

*Medicine,* Withholding medical treatment. *Probate Court,* Withholding medical treatment, Incompetent person. *Incompetent Person,* Consent to medical treatment, Right to refuse medical treatment. *Privacy.*

With respect to a ninety-two year old hospital patient who was suffering from severe mental illness and for whom the only realistic means of supplying nutrition would have required risky and highly intrusive surgical procedures with which she was unable or unwilling to cooperate, a probate judge, who applied a substituted judgment analysis, properly determined not to empower a temporary guardian to consent to the surgical procedures necessary to provide the patient with adequate nutritional support. [205-209]

With respect to a ninety-two year old hospital patient who was suffering from severe mental illness, a probate judge, who applied a substituted judgment analysis, appropriately concluded that a temporary guardian should be empowered to consent to the administration of antipsychotic drugs, where the treatment contemplated was relatively unintrusive and offered some hope of improving her mental condition. [209-210]

PETITION filed in the Essex Division of the Probate and Family Court Department on April 20, 1984.

The case was heard by *Buczko,* J.

*Robert A. Ledoux,* guardian ad litem (*Lisa Jacobowitz* with him).

*Karl Spitzer* for the ward.

*Margaret H. Raymond* for the petitioners.

*Jonathan M. Albano,* for Beverly Hospital, was present but did not argue.

ARMSTRONG, J. This is an appeal by a guardian ad litem from a judgment ordering the appointment of a temporary guardian for the ward with authority to consent to the administration of antipsychotic drugs but without authority to consent

to surgical procedures necessary to provide her with adequate nutritional support. All parties agree that the judgment was correct insofar as it appointed a guardian and authorized drug therapy. The issue on appeal is the correctness of the order relative to surgery.

The ward, Mrs. Mary Hier, ninety-two years old, has for many years suffered from severe mental illness. She was a patient for fifty-seven years at a psychiatric hospital in Middleton, New York, after which, in October, 1983, she was transferred to Beverly Nursing Home in Beverly, Massachusetts. Her care has been paid for by New York public assistance. Both in New York and in Massachusetts she has received thorazine to relieve her delusions and extreme agitation without suffering adverse side effects.[1] Thorazine treatment has been and, according to the consulting psychiatrist, continues to be, beneficial to Mrs. Hier, but she resists administration of it because of an aversion to being injected by needles.

Mrs. Hier has also suffered for many years from a hiatal hernia and a large cervical diverticulum, or sac, in her esophagus, the combined effect of which is to impede greatly her ability to ingest food orally.[2] In 1974, in New York, she received a gastrostomy, or a surgical implantation of a feeding tube directly through the abdominal wall into the stomach. Her medical records from New York, not reflected in the record before us but, according to the representations of counsel, made the basis of testimony before the probate judge, indicate that Mrs. Hier has repeatedly pulled out the gastric feeding tube. When this happens, reinsertion through the old stoma, or abdominal entrance hole, is possible without surgery, provided that reinsertion is accomplished in a relatively short time. Otherwise reinsertion requires open abdominal surgery. Ac-

---

[1] Anticipated side effects are said to include Parkinsonian symptoms, restlessness, dry mouth, constipation, blurry vision, dystomic reaction, and tardive dyskinesia. Compare *Guardianship of Roe*, 383 Mass. 415, 438-439 (1981).

[2] The probate judge found that "Mrs. Hier does not swallow food . . . She may ingest small portions of food placed in her mouth. Typically, however, most food placed in her mouth spills back out."

cording to an affidavit of a physician who has examined Mrs. Hier, her abdomen "shows multiple scars from her old gastrostomy tube sites and from [an] exploratory laparotomy site which was apparently used in re-insertion of [a] tube at one time."

In the week prior to April 8, 1984, Mrs. Hier pulled the gastrostomy tube from her abdomen on several occasions. Difficulties in replacing the tube at the nursing home finally caused her transfer to the Beverly Hospital on that date. There she cooperated with attempts to examine her but refused to allow reinsertion of the tube.[3] Several days later, when the attending physician, Dr. Roy Ruff, thought she might be more amenable to reinsertion, the surgeon who examined her determined that the stoma was almost completely closed and that replacement of the tube would now require an open abdominal operation.[4] Another surgeon, Dr. Randolph Maloney, sought to obtain Mrs. Hier's consent for surgery to replace the tube, and reported that "[s]he adamantly refused to have any surgery performed."

Because of the necessity to obtain a consent to the surgical procedure, and also because of the need to obtain court authorization for the administration of thorazine over the resistance of Mrs. Hier (see *Rogers* v. *Commissioner of Mental Health*,

[3] Dr. Mayo Johnson stated in his affidavit that he "saw Mrs. Hier on the evening of April 10, 1984. She did not speak to me but was quite cooperative. I told her that I wished to examine her abdomen and she permitted me to do so. There was a well healed scar in the upper abdomen and to the left of this the stoma, or site where the gastrostomy tube had been. It looked to me as if it might still be possible to replace the tube, even though it had been out for a few hours. I told her that I would try to do so and left the room to obtain a tube and a nurse to help me. When I returned with the tube the patient shook her head, clasped her hands over her abdomen and made it quite clear to me that she did not wish me to try to replace the tube. I made a note of this in the chart in the form of a consultation."

[4] The surgeon, Dr. Johnson (see n.3), on April 26 described the possibility of an alternative method of gastrostomy not involving open abdominal surgery. The method involves the insertion of a heavy silk thread through the abdominal wall into the stomach, drawing the thread up the esophagus by means of a gastroscope, then drawing the gastric tube down the esophagus by means of the thread and out the stomach and abdominal walls. The possibility of using this technique, which Dr. Johnson had read about but had no previous experience with, has been foreclosed as a practical matter because of the subsequent failure of attempts at gastroscopy in connection with attempted insertion of nasogastric tubes.

390 Mass. 489, 499-504 [1983]), the administrator of the nursing home and a nurse filed the petition for appointment of a guardian with authority to consent to the administration of thorazine and surgery to enable adequate nutritional support. Subsequent to initiating the action, the petitioners revised their position, still advocating the administration of thorazine but, in accordance with the recommendations of physicians (later to be discussed), opposing surgical intervention. The probate judge appointed a guardian ad litem and also an attorney to represent Mrs. Hier, who joined with the guardian ad litem in advocating surgery. Applying the substituted judgment approach articulated in *Superintendent of Belchertown State School* v. *Saikewicz,* 373 Mass. 728, 750-753 (1977), the probate judge determined, in the portion of his decision and judgment now appealed from, that Mrs. Hier, if competent to make the decision for herself, would reject all of the several forms of surgical intervention which might enable adequate nutritional support.

As is, unfortunately, often the case with patients greatly advanced in age or debilitation, practical constraints limit the potential utility of procedures which are ordinarily regarded as routine by physicians. In Mrs. Hier's case, supplying nutrition is a complex problem. Principally because of the esophageal diverticulum and to a lesser extent because of the hiatal hernia, ingestion of food and drink by mouth is a practical impossibility. See note 2, *supra*. Intravenous feeding, of the familiar type, presently the sole source of Mrs. Hier's hydration and nutrition, is useful as a short term technique only and mainly for hydration rather than as a source of an adequate and balanced diet. Generally intravenous feeding through the veins of the limbs is useful in furnishing water, sugar, salt, and medication, but the veins break down under such intravenous feeding and will quickly close up if used for the introduction of fats, proteins and vitamins necessary for balanced nutrition. Because of intravenous feeding since April 8, the veins in Mrs. Hier's arms have already broken down to the point where future intravenous feeding will be done through her legs.

Another alternative, suitable for long-term nutritional support, is the use of a nasogastric tube, a soft tube run into the nose, through the esophagus, directly into the stomach. A nasogastric tube is normally simple to put in place. In Mrs. Hier's case, it has so far proven impossible. The precise cause of the difficulty has not been ascertained: presumably it is related to the diverticulum and the hiatal hernia. Attempts to pinpoint the problem through endoscopy have similarly failed, in part because the patient resists both types of insertion vigorously.

Another theoretical possibility is the use of what is called central hyperalimentation, a form of intravenous feeding through the chest directly into the superior vena cava, a major vein located directly above the heart. Unlike intravenous feeding in the limbs, the fats and proteins necessary to a balanced and complete diet may be introduced over an extended period in this manner. The drawbacks to the technique are that it requires a high degree of attention and supervision and thus is generally restricted to patients in acute care hospitals or to patients who are capable of understanding and monitoring its use. To the best of the physicians' knowledge, central hyperalimentation is not being employed in nursing homes, and they agree it is not suitable for a patient who, like Mrs. Hier, would in all likelihood attempt to pull out the tube or interfere with the machinery that injects the nutritive substance. Such interference could lead to a reversal of the direction of flow through the tube and consequent loss of blood. Moreover, the procedure is inherently intrusive and attended by a high risk of infection.

A fifth possibility — the only one which seems reasonably feasible to the physicians, is open abdominal surgery to replace the gastric tube, or gastrostomy. Such a procedure is normally associated with a high likelihood of surgical success: less than a five percent chance of mortality. In Mrs. Hier's case, the complications are considerable, the likelihood of success somewhat questionable, and the risk of mortality somewhat higher: perhaps twenty percent or more. The scar tissue on the abdomen and, inferentially, on the stomach wall, coupled with fixation of

the stomach to the abdominal wall as a result of prior surgeries, portend a more difficult surgical procedure. The difficulties, while anticipated, cannot be adequately evaluated in advance due to the inability of the physicians to employ the usual preoperative testing procedures, such as an upper GI series or gastroscopy. The operation would probably require general anesthesia (unlike most gastrostomies), which is itself a risk to one of Mrs. Hier's age and weakened condition. After any such operation, she would have to be kept under restraint until the incision was fully healed, and most discouragingly, based on her history of repeated gastric tube dislodgements, the duration of any resulting benefit to her would be at best problematical.

A sixth theoretical possibility, surgical repair of the esophagus by removal of the diverticulum and correction of the hiatal hernia, would be a major surgery involving high risk and is recommended by no one.

Summarizing the medical evidence, the only realistic alternative to supply adequate nutrition to Mrs. Hier appears to be gastrostomy by open abdominal surgery; and, as to this procedure, two of the three physicians expressing a view recommend against employing it in the peculiar circumstances of this case.[5]

The guardian ad litem does not directly attack the judge's finding that Mrs. Hier, if competent, would elect to forgo the surgery. He urges, instead, that a failure to supply nutrition to Mrs. Hier, "who is not comatose, brain dead, or vegetative, and whose death is not irreversibly imminent, . . . cannot be

---

[5] The affidavit of Dr. Mayo Johnson, to the effect that he would not be willing to perform such an operation in the face of Mrs. Hier's firm opposition thereto, must be taken as a recommendation against the surgery. The recommendation of Dr. Randolph Maloney was unequivocally opposed. Dr. Roy Ruff, who admitted Mrs. Hier to Beverly Hospital, recommended the surgery at an early stage, and, absent indication to the contrary in the record before us, we assume for purposes of decision that his recommendation would be unaffected by Mrs. Hier's subsequent protests. A fourth physician, Dr. Kenneth Slater, a psychiatrist, did not directly recommend for or against surgery, focusing his affidavit on the questions of competency and need for thorazine. He did state that administration of the thorazine via the feeding tube would be safer and less painful than administration by injection.

permitted on [a] theory of [a] patient's right to privacy or, indeed, on any other basis"[6] He urges that we follow the cases of *In re Conroy,* 190 N.J. Super. 453 (App. Div. 1983), and *In re Storar,* 52 N.Y.2d 363, cert. denied, 454 U.S. 858 (1981). In the *Conroy* case, New Jersey's Appellate Division reversed an order of a trial judge permitting removal of a nasogastric tube from a patient who was apparently in the terminal stages of a severe organic brain syndrome,[7] characterizing the order as one authorizing euthanasia. The *Conroy* case cited and relied heavily on *In re Storar,* in which the New York Court of Appeals reversed a trial court order permitting termination of blood transfusions being used to extend the life of a profoundly retarded fifty-two year old man with terminal bladder cancer. The court stated that "the transfusions were analogous to food — they would not cure the cancer, but they could eliminate the risk of death from another treatable cause." (The latter referred to the bleeding caused by the bladder cancer.) The *Conroy* case distinguished *In re Quinlan,* 70 N.J. 10, cert. denied, 429 U.S. 922 (1976), which authorized removal from a respirator, on the ground that the patient in that case was comatose.[8]

The *Storar* case is not good authority in this jurisdiction. It explicitly rejected the substituted judgment approach (52 N.Y.2d at 380), and seemingly left New York law with no ve-

[6] The quoted material is taken from the proposed rulings of law submitted to the probate judge jointly by the guardian ad litem and the court-appointed attorney for Mrs. Hier.

[7] As described in the court's opinion (190 N.J. Super. at 455-458), the condition of the eighty-four year old patient, Claire Conroy, was comparable to that of the patient in *Matter of Dinnerstein,* 6 Mass. App. Ct. 466 (1978). The order authorizing removal of the nasogastric tube was stayed pending appeal, but Conroy died before the appeal was decided.

[8] "The distinction between an 'awake' but confused patient like Conroy and an 'asleep,' vegetative patient like Karen Quinlan is material and is determinative in this case. . . . [I]t is plain that *Quinlan* applied only to noncognitive, vegetative patients." *In re Conroy,* 190 N.J. Super. at 466. Review of the *Conroy* decision has been sought in the New Jersey Supreme Court, which, we are informed, has heard the case but has not yet rendered a decision.

hicle to enable withholding of life-prolonging measures to a patient incompetent to make the decision for himself, unless the patient (1) had, at some time, been competent, and (2) had expressed a wish when competent not to receive such measures.[9] It is the essential function of the substituted judgment analysis, formulated in the *Saikewicz* case and applied here by the probate judge, to secure to incompetent persons the same right to choose or reject treatment that is accorded to competent persons by the law of consent. See the *Saikewicz* case, 373 Mass. at 742; *Lane* v. *Candura,* 6 Mass. App. Ct. 377, 383 (1978); *Matter of Dinnerstein,* 6 Mass. App. Ct. 466, 473 (1978). In Massachusetts that right does not depend on the prior expression of a view when competent. *Matter of Spring,* 8 Mass. App. Ct. 831, 837-838 (1979), rev'd on other grounds, 380 Mass. 629 (1980).

The guardian ad litem has argued to us, in essence, that nutrition should be differentiated from treatment and the right of choice confined to the latter. We do not agree that such a distinction should be drawn as matter of law. Ethicists have urged, plausibly, that "[m]edical procedures to provide nutrition and hydration are more similar to other medical procedures than to typical human ways of providing nutrition and hydration, for example, a sip of water. It should be possible to evaluate their benefits and burdens, as we evaluate any other medical procedure." Lynn & Childress, Must Patients Always Be Given Food and Water?, 13 Hastings Ctr. Rep. 17, 20 (1983). The President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research has taken the position that artificial feeding should be thought of as a treatment decision, not mandated except where the bene-

---

[9] In *In re Eichner,* decided together with the *Storar* case at 52 N.Y.2d 363, the court allowed the petition of Brother Fox's Father Superior to terminate use of a respirator, but only because Brother Fox had clearly expressed that wish when competent. 52 N.Y.2d at 378-380. Rev. John Paris, commenting on the *Eichner* and *Storar* cases in 304 New England Journal of Medicine 1424, 1425 (1981), writes: "Except for directing him to the legislature, [New York's Court of Appeals] provides no mechanism, no analysis, and no source of relief for the inarticulate or unreflective patient who suffers Brother Fox's fate."

fits to be expected outweigh the burdens. See the President's Commission report, Deciding to Forego Life-Sustaining Treatment (1983), at 90, 288. Adopting that view, the California Court of Appeals has held appropriate a joint medical-familial decision to terminate the intravenous feeding of a vegetative patient. *Barber* v. *Superior Court,* 147 Cal. App. 3d 1006 (1983).

The decision before us in this case, however, is qualitatively different from those in the *Conroy* and *Barber* cases. In those cases the issue was whether to terminate ongoing nutritional support. Here the issue is whether to put an unwilling patient through a major surgical procedure in order to provide adequate nutritional support which is not possible through the ongoing intravenous feeding. The distinction we draw is not between terminating a procedure and commencing it in the first instance,[10] but between supplying nutritional support with only modest intrusiveness and supplying it through the use of highly intrusive surgical procedures. To be weighed in this connection are the complications presented by the patient's prior operations and resultant scar tissue; the inability to survey the complications in advance through the use of normal testing procedures, such as an upper GI series or gastroscopy; the relatively high risk to the patient due to her age and the complicating factors; and the need for physical restraints on the patient for roughly a week following surgery. These factors make the proposed gastrostomy substantially more onerous or burdensome for Mrs. Hier than it would be for a younger, healthier person.

In applying the substituted judgment analysis, the judge properly took into consideration the facts that the proposed operation is intrusive and burdensome; that Mrs. Hier has repeatedly and clearly indicated her opposition to procedures

---

[10] Distinguishing, as a basis for decisionmaking, between withholding and withdrawing treatment has been thoughtfully analyzed and criticized in Report of the President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Deciding to Forego Life-Sustaining Treatment, 72-77 (1983). See Lynn & Childress, Must Patients Always Be Given Food and Water?, 13 Hastings Ctr.Rep. 17, 19-20 (1983).

necessary to introduce tube feeding (both gastric and nasogastric); that the benefits to be realized from performing the gastrostomy are diminished by her repeated history of dislodgments; that such dislodgments can probably not be prevented except by the use of physical restraints; and that physicians who had seen Mrs. Hier and evaluated her condition were making thoughtful recommendations that surgery was inappropriate in her case.[11]

The expressions of opposition by Mrs. Hier, while those of an incompetent person, and thus not to be given legal effect, are nevertheless to be taken into consideration in applying the substituted judgment test because they are indicative of the burden that she feels in being subjected to advanced medical technologies. In the *Saikewicz* case the court took into consideration the fact that the ward would be unable to understand the reason for, and to cooperate in the administration of, an intrusive and potentially painful series of chemotherapy treatments. 373 Mass. at 750, 754. In the *Spring* case the court took into account the disruptive behavior exhibited by the patient when being subjected to dialysis. 380 Mass. at 632. In this case, Mrs. Hier's repeated dislodgments of gastric tubes, her resistance to attempts to insert a nasogastric tube, and her opposition to surgery all may be seen as a plea for privacy and personal dignity by a ninety-two year old person who is seriously ill and for whom life has little left to offer. If the substituted judgment approach has theoretical utility in the case of a person who has never had the capacity to express a meaningful view, it is that it focuses attention on, and requires giving weight to, the subjective ·wishes of the incompetent patient.

We see no inconsistency or tension between the judge's finding that Mrs. Hier would, if competent, opt for thorazine

---

[11] In addition the judge noted that Mrs. Hier's religion (Roman Catholicism) would not impose ethical constraints on her treatment choice. He mentioned this factor in connection with the thorazine decision, but it appears to be equally true with respect to the surgery. See, in this respect, the Statement of the Sacred Congregation for the Doctrine of the Faith (1980), appearing in the Report of the President's Commission, Deciding to Forego Life-Sustaining Treatment, Appendix B, 300-307 (1983).

treatment but would elect otherwise with respect to the proposed surgery. Unlike the gastrostomy, the thorazine treatment is relatively nonintrusive and offers some hope of relief from the torment of her mental illness. The possible side effects (none of which she has experienced in the past) are of relatively little consequence to one in Mrs. Hier's condition; and her opposition seems to be not to the thorazine itself but to the needle injections necessary to administer it. The judge could reasonably find that, if she were able to appreciate the prospective benefit, Mrs. Hier would look beyond the minor pain associated with hypodermic injection but that she would feel otherwise with respect to a major surgery of dubious benefit and, to her, substantial burden. Nor is there inconsistency implicit in the judge's finding that Mrs. Hier has expressed a wish to live and has also expressed a wish to die. To the extent that weight can be attached to her verbal expression, this finding can be thought indicative of a not uncommon vacillation in attitude by one for whom the value of living is increasingly obscure and the measures necessary to sustain it are increasingly bur- densome. Compare *Lane* v. *Candura,* 6 Mass. App. Ct. at 381-382. The judge's determination of substituted judgment is not erroneous on the record before us.

The several interests of the State which might in some cases cause the wish of the patient to be overborne (see the *Saikewicz* case, 373 Mass. at 741) are not of decisive significance in this case. There are no third parties whose interests require protec- tion; considerations of medical ethics do not require the surgery; and the State's interest in preventing suicide is not implicated in a decision to forgo major surgical intervention. See *Commissioner of Correction* v. *Myers,* 379 Mass. 255, 262 (1979). "The general State interest in the preservation of life — most weighty where the patient, properly treated, can return to reasonable health, without great suffering, and a decision to avoid treatment would be aberrational — carries far less weight where the patient is approaching the end of his normal life span, where his afflictions are incapacitating, and where the best that medicine can offer is an extension of suffering." *Matter of Spring,* 8 Mass. App. Ct. at 845-846, *S.C.,* 380 Mass. at 641.

It remains only to observe that, as suggested by the counsel for Mrs. Hier, there is a possibility that the thorazine treatment authorized by the judge may, by lessening Mrs. Hier's agitation, cause her to become acquiescent towards the surgery. Mrs. Hier's opposition was a substantial factor in the judge's substituted judgment analysis, and should a meaningful change in that respect occur, the probate judge may of course be asked to reconsider the decision in the light of the changed circumstances. See *Matter of Spring*, 380 Mass. at 630-631, 641. On the facts as they were at the time of his decision, however, the judge's determination cannot be said to have been erroneous.

*Judgment affirmed.*