JEAN ELBAUM, as Conservatee, by MURRAY ELBAUM, as Conservator, Appellant, v GRACE PLAZA OF GREAT NECK, INC., et al., Respondents. DENIS DILLON, as District Attorney of Nassau County, Respondent.

Second Department, August 2, 1989

### APPEARANCES OF COUNSEL

*Werbel McMillin & Carnelutti, P. C. (Joseph D. Pope* of counsel), and *Wachtell, Lipton, Rosen & Katz* for appellant. (One brief filed.)

*Spector Scher Feldman Karassik & Levy (Joel J. Spector* of counsel), for defendants-respondents.

*Denis Dillon, District Attorney (Bruce E. Whitney* and *John F. McGlynn* of counsel), nonparty respondent *pro se.*

*M. Rose Gasner* and *Fenella Rouse,* and *Sinnreich & Wasserman (Richard Wasserman* of counsel), for Society for the Right to Die, Inc., *amicus curiae.* (One brief filed.)

### OPINION OF THE COURT

Per Curiam.

■ ■ The threshold issue presented on this appeal is whether it has been shown by clear and convincing proof that the conservatee, Jean Elbaum, who is in an irreversible, persistent, vegetative state without hope of recovery, and is presently receiving nutrition and hydration through a gastrointestinal tube, made a firm and settled decision, while competent, to decline such treatment under her present circumstances. Assuming that such a showing has been made, a further issue which has been raised by the defendant Grace Plaza of Great Neck, Inc. (hereinafter Grace Plaza), the nursing home in which Mrs. Elbaum has been a patient for almost three years, is whether Mrs. Elbaum's wishes may be overcome by the nursing home's interest in safeguarding what it perceives to be the ethical integrity of both the facility and the medical profession. We respond to the initial question posed in the affirmative and we find no basis for Grace Plaza's refusal to allow Mrs. Elbaum's wishes to be carried out.

### I.

On June 30, 1986, the then-approximately 60-year-old Jean Elbaum was admitted to North Shore University Hospital suffering from headaches, memory difficulties and confusion. A CAT scan performed after Mrs. Elbaum's admission to the hospital revealed the existence of subarachnoid bleeding. During the next 30 to 48 hours, according to Mrs. Elbaum's attending physician, Dr. Jeffrey Kessler, Mrs. Elbaum's condition markedly deteriorated. She thereafter fell into a deep

coma and became unresponsive except for reflex responses and other brain stem reflexes that remained preserved. During the several weeks thereafter, Mrs. Elbaum's condition continued to deteriorate despite the hospital's efforts. Dr. Kessler stated that during this period he authorized the use of a nasogastric tube, which was inserted through Mrs. Elbaum's nose and into her stomach, to provide her with nutrition and hydration. On July 28, 1986, Dr. Kessler diagnosed Mrs. Elbaum as being in an irreversible, persistent, vegetative state with no hope of recovery. Notably, this diagnosis is not controverted by any evidence in the record.

According to Dr. Kessler's testimony, he did not apprise Mrs. Elbaum's husband or children of his diagnosis until sometime between July 28 and August 6, 1986. When the Elbaum family was ultimately informed of Mrs. Elbaum's physical condition, Dr. Kessler also advised them that because Mrs. Elbaum was severely neurologically impaired, the continued use of a nasogastric tube as a means of feeding was not desirable. Rather, a gastrointestinal feeding tube, inserted through the abdominal wall during a surgical procedure known as a gastrostomy, would be necessary. The family was also informed that Mrs. Elbaum would require long-term nursing care and that no nursing home would accept her as a patient without a gastrostomy having been performed. When the insertion of a gastrointestinal tube was initially proposed, Mr. Elbaum asked what would happen if he refused to give his consent to such a procedure. Dr. Kessler responded that the hospital would be required to commence legal proceedings to authorize such a procedure. Mr. Elbaum informed Dr. Kessler that the Elbaum family was reluctant to consent to the insertion of the gastrointestinal tube in view of Mrs. Elbaum's previously expressed wishes to the contrary. According to Dr. Kessler, the Elbaum family continued to "drag their feet and be extremely reluctant to sign for the gastrostomy", but their consent was finally provided after the family was repeatedly told that legal proceedings would result unless consent was given. The gastrostomy was performed on September 2, 1986, and 2½ weeks later, Mrs. Elbaum was transferred to Grace Plaza.

On the eve of her transfer to the nursing home, Mr. Elbaum and his daughter met with the defendant Dr. Lester Corn, the medical director for Grace Plaza, and, according to their testimony, advised him that Mrs. Elbaum had previously stated that in the event she was ever in a "vegetable-like"

state with no hope of recovery, she would not want to be kept alive, and that she had specifically stated that she did not want the use of a respirator, antibiotics or tubes to keep her alive. Dr. Corn testified, however, that while he was told about the circumstances under which the gastrointestinal tube had been implanted, Mr. Elbaum and his daughter merely advised him that he was not to intervene or perform any heroic measures to prolong Mrs. Elbaum's life. Dr. Corn stated further that neither Mr. Elbaum nor his daughter suggested, at that time, that the gastrointestinal tube be removed.

Shortly after Mrs. Elbaum's arrival at Grace Plaza, Mr. Elbaum, by letter dated September 22, 1986, provided Grace Plaza with a "Do Not Resuscitate" order (hereinafter DNR order) whereby the nursing home was advised that his wife was to receive no resuscitation and that no heroic measures were to be taken to sustain her life. The order further provided that, in the event Mrs. Elbaum developed an infection, no antibiotics or drug treatments were to be administered, and that no mechanical or other artificial respiratory means were to be used to sustain her life. According to Mr. Elbaum, after he provided Grace Plaza with the DNR order, he repeatedly advised Dr. Corn, on at least 6 to 12 different occasions, of his wife's wishes with respect to the nonuse of respirators, tubes and antibiotics. On those occasions, Mr. Elbaum advised Dr. Corn that his wife had expressly stated that she would not want the use of feeding tubes if she were in an irreversible vegetative state. According to Mr. Elbaum, some of his discussions with Dr. Corn on these occasions were precipitated by the fact that the nursing home continued to administer antibiotics without Mr. Elbaum's prior knowledge or consent. Dr. Corn admitted that he never notified the Elbaum family that he had administered antibiotics to Mrs. Elbaum in 1987. Dr. Corn stated, however, that these treatments were necessary to prevent the possible spread of infection to the other patients.

By letters dated October 6, 1987, Mr. Elbaum advised both Dr. Corn and Celia Strow, the administrator of Grace Plaza, that in keeping with his wife's previously described wishes, the gastrointestinal tube should be removed and that Dr. Corn, the nursing home and its staff should "refrain from administering anything other than comfort care to her". Mr. Elbaum stated that he had not put his wife's wishes in writing to the nursing home previously because he fully expected that Dr. Corn, who was aware of Mrs. Elbaum's wishes, would comply with those wishes. By letter dated October 9, 1987, Dr.

Corn responded to Mr. Elbaum's request and stated that the withdrawal of the gastrointestinal tube was contrary to the "dedication, to the law and to the policies and philosophy of Grace Plaza". Thereafter, Mr. Elbaum ceased making any payments to Grace Plaza for his wife's care.

Celia Strow testified that after her receipt of Mr. Elbaum's written request for withdrawal of his wife's gastrointestinal tube, she orally informed Mr. Elbaum of the facility's policy against such an action and that she, thereafter, attempted without success to find a suitable nursing facility for Mrs. Elbaum which would accede to Mr. Elbaum's request. By letter dated February 16, 1988, Ms. Strow advised Mr. Elbaum that the search for a transfer site had been unsuccessful. Moreover, Ms. Strow stated that the nursing home did not have a clear indication of Mrs. Elbaum's wishes, and "even if irrefutable evidence" was forthcoming establishing that she would want the gastrointestinal tube removed, the nursing home would not remove it. Ms. Strow also advised Mr. Elbaum that he was presently in arrears in the sum of approximately $18,500 in medical payments for his wife's care and that unless payment thereof was received, legal proceedings for the recovery thereof would be initiated. During the hearing on the instant application, Ms. Strow acknowledged that Grace Plaza's policy concerning the withdrawal of feeding tubes was put in writing only after the Elbaum case arose in June 1988. Ms. Strow insisted, however, that this policy had always existed and that if any patient or family had made an inquiry regarding this policy, they would have been advised thereof.

Thereafter, in June 1988 Mr. Elbaum, as his wife's conservator, instituted this action on his wife's behalf seeking, *inter alia,* to permanently enjoin Grace Plaza and Dr. Corn from providing nutrition and hydration to Mrs. Elbaum through any mechanical or artificial means or devices and to direct the defendants to cease providing any other artificial life-sustaining treatment to her. Following service of the defendants' answer, the Supreme Court conducted an evidentiary hearing to determine Mrs. Elbaum's wishes.

At the hearing, Mr. Elbaum, who has been married to Mrs. Elbaum for over 36 years, testified that his wife first expressed her views on extraordinary or artificial life-sustaining medical treatment in the context of the Karen Ann Quinlan case *(see, Matter of Quinlan,* 137 NJ Super 227, 348 A2d 801, *mod* 70 NJ 10, 355 A2d 647, *cert denied sub nom. Garger v New Jersey,*

429 US 922). At that time, Mrs. Elbaum remarked "how awful it must be for the parents to sit vigil over a virtually dead and comatose daughter" and she stated that if she were in a similar situation "she would not want to be on any respirator or any other mechanical means, she wanted to die". Mr. Elbaum testified that another conversation with his wife on this topic was triggered by the Sunny Von Bulow matter. According to Mr. Elbaum, his wife expressed an inability to comprehend how the Von Bulow family could permit Mrs. Von Bulow to be sustained as a "vegetable" and he quoted his wife as subsequently stating that "I do not want to be sustained as a vegetable, I want to die with some dignity".

Mr. Elbaum also related the circumstances surrounding a third occasion during which Mrs. Elbaum expressed her views with respect to the subject. He stated that in 1982 a family friend suffered a stroke and was rendered unconscious while riding in the Elbaums' car. The Elbaums took the friend to a nearby hospital, at which time they were informed that the friend was comatose. Thereafter, while the Elbaums were returning home from the hospital, Mrs. Elbaum told her husband, "Murray, I want you to tell me now, I am telling you and I want you to tell me that you will not do anything to sustain my life in the event I am a vegetable. I want it to end, I don't want to be sustained". Thereafter, Mr. Elbaum testified, he and his wife again discussed the incident, and she stated "If I am ever in a similar state and it is hopeless, I don't want to be sustained by any tubes or machines or antibiotics".

Mrs. Elbaum's sister, Mrs. Renee Schutzer, similarly testified to separate conversations with her sister concerning the Karen Ann Quinlan and Sunny Von Bulow cases, and added that on another occasion after Mrs. Elbaum saw the film "Whose Life Is It Anyway?", which involved the right of an incapacitated individual to decline medical treatment, Mrs. Elbaum stated that that was a "horrible situation" and "it was very disturbing to her". Further, Mrs. Schutzer explained that when their mother was terminally ill with cancer and the sisters witnessed their mother being fed through a nasogastric feeding tube, Mrs. Elbaum became "very adamant about pledging to me and asking me to pledge to her that these measures would not be administered to her or me if there was no hope of recovery". According to Mrs. Schutzer, Mrs. Elbaum spoke at that time about forced feeding, respiratory assistance, and medication. Mrs. Schutzer testified fur-

ther that, on many occasions after their mother's death, her sister expressed her regret at permitting the use of such measures on their mother. Thereafter, the sisters "made a pledge to one another not to permit it to be done to one another if there was no hope of recovery". Additionally, Mrs. Schutzer testified that when their mother's tombstone was unveiled approximately two weeks before Mrs. Elbaum became ill, the sisters again discussed "where [they] had gone wrong in handling [their] mother's death" and they again pledged to one another that "if it was within our power, we would not permit these life-prolonging measures if there was no hope".

Mrs. Elbaum's son, Joshua, also testified as to his mother's agreement with the decision made by Karen Ann Quinlan's parents to disconnect their daughter from a respirator and as to her support for the protagonist's decision to refuse medical treatment in "Whose Life Is It Anyway?". When Mrs. Elbaum spoke to her son regarding the stroke suffered by the family friend in 1982, she stated that she was "simply appalled by the tubes and machines and that she would not want to die like that". Similarly, Mrs. Elbaum's son stated that his mother was shaken by his grandmother's death and indicated that she did not want "to die a slow lingering death like her mother did". Further, with regard to his mother's reaction to the Sunny Von Bulow case, Mrs. Elbaum's son stated that Mrs. Elbaum asked him to ensure that if she were ever in a coma-like state, he and his sister would do everything they could not to maintain her, since she believed there was no real sense to that type of existence.

Finally, Mrs. Elbaum's daughter, Anne, testified that on one occasion after she and her mother had visited Mrs. Elbaum's mother, Mrs. Elbaum stated that, in her opinion, it was ridiculous for her mother to be kept alive "like that" and that she never wanted to be kept alive if her condition was hopeless. According to the daughter, after Mrs. Elbaum observed the nasogastric feeding tube inserted in her mother, Mrs. Elbaum "had nightmares about it" and "[s]he couldn't get that out of her head" and Mrs. Elbaum stated that she never wanted any tubes put into her because she wanted to die naturally and quickly.

## II.

At the conclusion of the evidentiary hearing, the trial

court determined that insufficient evidence had been adduced to establish by clear and convincing proof that Mrs. Elbaum, while competent, made a firm decision that she would not want the use of a feeding tube to keep her alive if she were in a persistent vegetative state with no hope of recovery. The court concluded that Mrs. Elbaum's statements concerning the use of artificial and extraordinary means to prolong life, which were attested to by her husband, sister and children, were merely emotional responses to unsettling events and were not contemplative in nature. The court reasoned that denial of the application was required because of the absence of any evidence indicating that Mrs. Elbaum, while competent, had specifically contemplated death by starvation or dehydration, or that she was familiar with the consequences thereof. Finally, the court took the position that the State's interest in preserving the integrity of the medical profession outweighed Mrs. Elbaum's interest in declining treatment since Grace Plaza and its staff would be required to perform a morally objectionable act which would conflict with Federal and State statutes which permit health care facilities and physicians to decline to perform abortion and sterilization procedures *(see,* 42 USC § 300a-7 [d]; Civil Rights Law § 79-i). Accordingly, the court dismissed the plaintiff's complaint. We disagree with the Supreme Court's determination.

### III.

Our task on this application is to determine whether Jean Elbaum would direct the termination of nutrition and hydration under her present circumstances if she were currently competent and able to communicate *(see, Matter of Westchester County Med. Center [O'Connor],* 72 NY2d 517, 530). In making our determination, we must ensure that the proof "clearly and convincingly" *(Matter of Westchester County Med. Center [O'Connor], supra,* at 531) envinces an intent to reject such life-prolonging measures, and that the proof is not " ' "loose, equivocal or contradictory" ' " *(Matter of Storar,* 52 NY2d 363, 379, quoting *Backer Mgt. Corp. v Acme Quilting Co.,* 46 NY2d 211, 220; *Matter of Delio v Westchester County Med. Center,* 129 AD2d 1, 22). Because our review of the evidence turns upon the interpretation of Mrs. Elbaum's past statements and expressed wishes, our inquiry is "narrowed to the patient's expressed intent, with every effort made to minimize the opportunity for error" *(Matter of Westchester*

*County Med. Center [O'Connor], supra,* at 530). Thus, Mrs. Elbaum's statements may not be relied upon as expression of intent if they were merely "immediate reactions to the unsettling experience of seeing or hearing of another's unnecessarily prolonged death" *(Matter of Westchester County Med. Center [O'Connor], supra,* at 532), or if they were so general in nature as to fail to indicate what her precise intent was at the time she made these pronouncements *(supra,* at 530). In reviewing the evidence before us, we must consider the possibility that Mrs. Elbaum either may have thereafter changed her mind, or that she made the statements without reflection or resolve, or that third parties are seeking to impose their own substitute judgment in her stead *(Matter of Storar,* 52 NY2d 363, 380-383, *supra).* In addition, we must assure that "the infirmities [that Mrs. Elbaum] was concerned with and the procedures she eschewed" at the time she made her statements are not "qualitatively different than those now presented" *(Matter of Westchester County Med. Center [O'Connor],* 72 NY2d 517, 533, *supra).*

Contrary to the conclusion reached by the Supreme Court, we find the fact that Mrs. Elbaum, while competent, repeatedly extracted a series of promises from her husband and family members to be highly significant since it reflects a serious and consistent purpose of mind and an intent to bind others to effectuate her desires *in futuro (see, Matter of Delio v Westchester County Med. Center,* 129 AD2d 1, 7-8, *supra).* Although some of these promises were extracted in immediate response to unsettling events, such as the family friend's stroke in 1982 and her observations of her mother being fed by means of a nasogastric tube, the record establishes that Mrs. Elbaum reiterated her views and extracted renewed promises from those same family members under less emotional circumstances *(see, Matter of Storar,* 52 NY2d 363, 380, *supra; Matter of Delio v Westchester County Med. Center, supra).* Although the individuals involved in the *Matter of Storar (supra)* and *Matter of Delio v Westchester County Med. Center (supra)* cases had religious and medical vocations, respectively, which provided more numerous occasions upon which to reflect on this subject in a detached manner, we find that the record as a whole in this case establishes that Mrs. Elbaum's statements and reflections on the subject of artificial and extraordinary life-sustaining medical treatments were made with a similar resolve and purpose so as to constitute "solemn pronouncements" *(Matter of Storar, supra,* at 380; *see*

also, Matter of Delio v Westchester County Med. Center, supra, at 22).

■ Additionally, we find the evidence adduced at the hearing to be sufficiently clear and convincing to establish that the physical infirmities and the artificial and extraordinary life-sustaining medical treatments which Mrs. Elbaum was contemplating at the time she made these solemn pronouncements were qualitatively similar to her current physical condition and the medical treatment which she is presently receiving (see, Matter of Westchester County Med. Center [O'Connor], 72 NY2d 517, 532-533, supra; Matter of Storar, 52 NY2d 363, 380, supra). Mrs. Elbaum consistently referred to "hopeless circumstances"; she repeatedly indicated that she did not wish to be sustained as a "vegetable", and the uncontroverted medical testimony establishes that she is, indeed, in an irreversible, persistent, vegetative state and that there exists no hope for recovery. Mrs. Elbaum also abhorred and regretted the use of a nasogastric feeding tube on her terminally ill mother and she subsequently sought to prevent the use of similar treatments if she became a "vegetable" with no hope of recovery.

Moreover, the fact that the Elbaum family did not object to the initial use of a nasogastric tube and other extraordinary medical procedures while Mrs. Elbaum was in North Shore University Hospital is not fatal to the plaintiff's case. The record reflects that at that point in time, Mrs. Elbaum's condition had not been diagnosed as "hopeless". Additionally, when the Elbaum family was ultimately informed of Dr. Kessler's final diagnosis, their consent to the insertion of a gastrointestinal tube was made under the threat of legal proceedings.

We reject the assertion that Mr. Elbaum was motivated solely by economic factors when he served his October 1987 letters on the defendants and directed the removal of Mrs. Elbaum's gastrointestinal tube. Rather, we view Mr. Elbaum's letters and his subsequent cessation of payments to Grace Plaza as a protest against the defendants' disregard for his DNR order and their continued use of a gastrointestinal feeding tube over his objection. Mr. Elbaum's DNR order refusing antibiotic and medical treatment to Mrs. Elbaum clearly put the defendants on notice that rights far greater than those delineated in Public Health Law article 29-B were being asserted since that statute only authorizes third-party surrogates to decline cardiopulmonary resuscitation on the

patient's behalf under certain circumstances *(see,* Public Health Law § 2960 *et seq; see also,* 10 NYCRR 405.43). The evidence reflects that despite the receipt of Mr. Elbaum's DNR order and despite Mr. Elbaum's complaints concerning the administration of antibiotics and the use of feeding tubes on his wife, the defendants ignored Mr. Elbaum's demands while simultaneously insisting upon payment for their undesired services. In this same vein, the fact that Mr. Elbaum issued the DNR order pursuant to the narrowly drawn substituted judgment statute, does not, in our view, undermine the claim now asserted on his wife's behalf. Mrs. Elbaum's rights and those asserted in the DNR order are not mutually exclusive and Mr. Elbaum's DNR order does not support the conclusion that the claim he now pursues on his wife's behalf is based upon his substituted judgment.

## IV.

 Finally, we address the defendants' contention that Mrs. Elbaum's wishes are outweighed by Grace Plaza's interest in maintaining its perceived ethical integrity as well as that of the medical profession. Four compelling State interests may, under certain circumstances, override a patient's common-law right of self-determination, namely: (1) the preservation of life, (2) the prevention of suicide, (3) the protection of innocent third parties, and (4) the maintenance of the ethical integrity of the medical profession *(see, Matter of Storar,* 52 NY2d 363, *supra; Matter of Fosmire v Nicoleau,* 144 AD2d 8, 14-16; *Matter of Delio v Westchester County Med. Center,* 129 AD2d 1, 23-26, *supra).* The only countervailing State interest which has been raised by the defendants is the perceived ethical integrity of Grace Plaza and the medical profession as a whole. Notably, the interest of maintaining the medical profession's ethical integrity has been overcome, or at least sufficiently lessened, by prevailing ethical standards which do not require medical intervention at all costs. Indeed, if the patient's right to informed consent is to have any meaning at all, it must be accorded respect even when it conflicts with the advice of the doctor or the values of the medical profession as a whole *(Matter of Delio v Westchester County Med. Center,* 129 AD2d 1, 25-26, *supra; see also, Matter of Westchester County Med. Center [O'Connor],* 72 NY2d 517, 528, *supra).* On this point, we note that the defendants' reliance on 42 USC § 300a-7 and Civil Rights Law § 79-i, in support of their position that they cannot be compelled to participate in the

cessation of nutrition and hydration to a patient, is misplaced since those statutes concern the right to decline to perform requested sterilization and abortion procedures based upon moral or religious convictions (see, *Gray v Romeo,* 697 F Supp 580, 589). Additionally, in reaching the conclusion that the interest in preserving the perceived ethical integrity of Grace Plaza is outweighed by Mrs. Elbaum's wishes in declining nutrition and hydration under these circumstances, we find significant the fact that the defendants failed to make the facility's policy on this issue known to the Elbaum family until after the family requested the removal of the gastrointestinal tube. Thus, the Elbaum family had no reason to believe that Mrs. Elbaum was relinquishing her right of self-determination with regard to her medical care upon her admission to the facility (see, *Gray v Romeo,* 697 F Supp 580, 589, *supra; see also, Matter of Jobes,* 108 NJ 394, 529 A2d 434, 450-451, *reconsideration denied* 108 NJ 589, 531 A2d 1360; *Matter of Requena,* 213 NJ Super 475, 517 A2d 886, 890-891, *affd* 213 NJ Super 443, 517 A2d 869). Under these circumstances, we conclude that, in the event the parties are unable to effectuate Mrs. Elbaum's transfer to a suitable nursing care facility which would accede to Mrs. Elbaum's wishes concerning the removal of the gastrointestinal tube within 10 days of the date of this opinion and order, the defendants will be required to comply with Mrs. Elbaum's wishes.* The evidence in the record reveals that Grace Plaza has previously permitted physicians who are not affiliated with the facility to treat its patients. Thus, in the event that no member of the Grace Plaza medical staff is willing to accede to Mrs. Elbaum's wishes, Grace Plaza must permit a physician selected by the Elbaums to carry out Mrs. Elbaum's wishes at the facility.

Accordingly, the judgment is reversed insofar as appealed from and the plaintiff is granted an injunction to the extent that, in the event that the parties are unable to effectuate Mrs. Elbaum's transfer to a suitable nursing facility which would accede to Mrs. Elbaum's wishes concerning the removal

---

* Unlike the factual circumstances in *Matter of Delio v Westchester County Med. Center* (129 AD2d 1), we find that the circumstances of this case preclude the possibility of transferring Mrs. Elbaum to her home if another nursing facility cannot be found. The evidence reveals that Mr. Elbaum was hospitalized in April 1987 due to a heart attack, that he suffers from diabetes and high blood pressure and he was advised by his cardiologist that his wife's return to his home under the present circumstances would have a deleterious effect on his physical and psychological well-being.

of her gastrointestinal tube within 10 days of the date of this opinion and order, the defendants are directed to assist in the removal of Mrs. Elbaum's gastrointestinal tube or to permit a physician selected by the family to enter the facility for the purpose of disconnecting the gastrointestinal tube.

MOLLEN, P. J., THOMPSON, BROWN, KUNZEMAN and RUBIN, JJ., concur.

Ordered that the judgment is reversed insofar as appealed from, on the law and the facts, with costs payable by the defendants, and the plaintiff is granted an injunction to the extent that, in the event that the parties are unable to effectuate Mrs. Elbaum's transfer to a suitable nursing facility which would accede to Mrs. Elbaum's wishes concerning the removal of her gastrointestinal tube within 10 days of the date of this opinion and order the defendants are directed to assist in the removal of Mrs. Elbaum's gastrointestinal tube or to permit a physician selected by the family to enter the facility for the purpose of disconnecting the gastrointestinal tube.