82 N.Y.2d 10 (1993)
623 N.E.2d 513
603 N.Y.S.2d 386
Grace Plaza of Great Neck, Inc., Respondent,
v.
Murray Elbaum, Appellant.
Court of Appeals of the State of New York.
Argued August 31, 1993.
Decided October 14, 1993.
Carro, Spanbock, Kaster & Cuiffo, New York City (Joseph D. Pope of counsel), for appellant.
Proskauer Rose Goetz & Mendelsohn, New York City (Steven E. Obus, Edward S. Kornreich and Betsy R. Martin of counsel), for respondent.
Ann E. Fade, New York City, for Choice In Dying, Inc., amicus curiae.
John J. Regan, Hempstead, for the Association of the Bar of the City of New York, amicus curiae.
Meyer, Suozzi, English & Klein, P. C., Mineola (Michael A. Ciaffa of counsel), Rivkin, Radler & Kremer, Uniondale (Evan H. Krinick of counsel), and Russo & Kramer, Westbury (David A. Smith of counsel), for the Coalition of Institutionalized Aged and Disabled, Inc., and others, amici curiae.
James Bopp, Jr., Thomas J. Marzen, Daniel Avila and John Altomare, of the Indiana Bar, admitted pro hac vice, for the Ethics and Advocacy Task Force of the Nursing Home Action Group, amicus curiae.
Melinda Aikins Bass, White Plains, for Nassau County Health Facilities Association, amicus curiae.
O'Connell and Aronowitz, Albany (Cornelius D. Murray, Sarah W. Birn and Pamela A. Nichols of counsel), for the New York State Health Facilities Association, Inc., amicus curiae.
Judges TITONE, HANCOCK, JR., BELLACOSA and SMITH concur with Judge SIMONS; Judges HANCOCK, JR., and BELLACOSA concur in separate opinions; Chief Judge KAYE and Judge LEVINE taking no part.
*14 SIMONS, J.
On September 19, 1986 plaintiff Grace Plaza of Great Neck, a long-term care facility, admitted Jean Elbaum as a patient. She had been transferred from North Shore University Hospital following treatment for a stroke. At the time of her admission to Grace Plaza, Mrs. Elbaum was in a persistent vegetative state and had to be fed through a gastrostomy tube. In October of 1987, her husband, defendant here, advised plaintiff by letter that it was his wife's wish that she be allowed to die naturally should she fall into an "irreversible vegetative state", and he instructed the nursing home to remove Mrs. Elbaum's feeding tube. At admission, defendant had signed an agreement undertaking responsibility for his wife's care but when plaintiff declined to remove the feeding *15 tube, he refused to pay for further treatment. This action by plaintiff followed to recover payment for services rendered to Mrs. Elbaum after October 1987. Supreme Court granted defendant summary judgment but the Appellate Division reversed.[*]
The thrust of the defense is that Mr. Elbaum is not liable because plaintiff breached the admission agreement. Defendant contends that because Mrs. Elbaum had a right under the contract, as well as under statutory and constitutional law, to determine the course of her own treatment and to discontinue life support systems, her continued treatment in contravention of her wishes violated the contract and excused any obligation to pay. In answer, plaintiff states the obvious, that Mrs. Elbaum was unable to state her wishes, that defendant did not present any documentary evidence indicating his wife's intentions and that he could not make the decision to discontinue life support systems for her (see, Matter of Westchester County Med. Ctr. [O'Connor], 72 N.Y.2d 517; Matter of Storar, 52 N.Y.2d 363, cert denied 454 US 858). Plaintiff asserts that until the courts finally declared what Mrs. Elbaum's wishes were, it could not know that she did not desire continued nutrition and hydration.
New York law has long recognized the right of competent individuals to decide what happens to their bodies (Schloendorff v Society of N. Y. Hosp., 211 N.Y. 125). That right to personal autonomy is rooted not only in common law but also in the Constitution (Cruzan v Director, Mo. Dept. of Health, 497 US 261, 278-279; Rivers v Katz, 67 N.Y.2d 485, 493) and includes the right to decline even life-preserving treatment (Matter of Fosmire v Nicoleau, 75 N.Y.2d 218, 226; Matter of Westchester County Med. Ctr. [O'Connor], supra; Matter of Eichner [Matter of Storar], 52 N.Y.2d 363, supra). In addition, *16 section 2803-c of New York's Public Health Law imposes on every nursing home a duty to honor a patient's decision to refuse treatment. Patients who do not consent and communicate that lack of consent are not liable for any treatment provided in contravention of their wishes (Shapira v United Med. Serv., 15 N.Y.2d 200).
Defendant contends that the obligation rested on plaintiff to seek a judicial determination of Mrs. Elbaum's wishes. He correctly points out that her wishes did not come into existence at the moment a court determined what they were; to the contrary and by definition, they existed prior to the onset of her comatose state. There is no principled reason, he asserts, for distinguishing between the rights of competent patients and those of incompetent patients. If Mr. Elbaum is required to pay for services the courts ultimately found Mrs. Elbaum did not desire, her rights have been diminished because she was incompetent. He contends the provider should be required to pay for the undesired care because it denied his wife her legal right to determine the course of her own treatment.
Though decisions in cases such as this may now be facilitated by use of proxies or living wills (see, Public Health Law art 29-C [eff Jan. 18, 1991]), the statutes authorizing such instruments were not in effect at the time in question, and neither side disputes that under the New York law as it then existed, the patient alone had the right to decide on terminating life support systems (see, Matter of Westchester County Med. Ctr. [O'Connor], supra). The law of this State was clear: surrogate decisions are not recognized (Matter of Eichner [Matter of Storar], supra; and see, O'Connor, supra, at 528, see also, concurring opn of Hancock, Jr., J., at 535, and dissenting opn of Simons, J., at 541). Though our rule reserving the right to the patient is more inflexible than that followed by most of our sister States, it is within the power of the individual States to adopt such a rule and also to impose higher standards of proof for determining the wishes of incompetent persons than for determining the wishes of those who are competent (Cruzan v Director, Mo. Dept. of Health, 497 US 261, 287, n 12, supra). Acting on that premise, we have required the families of hopelessly ill patients who are unable to express their wishes with respect to continuing care to establish by clear and convincing evidence that the patient when sentient expressed a clear and settled wish that care should not be continued under the circumstances (see, Matter of Westchester County Med. Ctr. [O'Connor], supra). *17 If a provider harbors some uncertainty on the matter, it acts within the dictates of O'Connor if it refuses to discontinue treatment until the issue is legally determined (see, id., at 531). By doing so, it does not breach a contract of care nor impair its right to be paid for services rendered.
We would but add that in many, perhaps most cases, providers will appropriately consider the family's evidence on the matter conclusive and honor requests to terminate treatment of a hopelessly ill patient (see, Matter of Eichner [Matter of Storar], supra, at 382). By doing so they not only avoid continued anguish for the family but also avoid imposing on all parties the expense and delay that accompanies legal proceedings to resolve the question. However, judicial resolution of the question may be required if the family members are divided or uncertain in their understanding of the patient's wishes, if the provider entertains doubts about the state of the law or if it has legitimate professional reservations about the procedure requested. In such cases it may seek a judicial determination of the matter itself or insist that the family do so.
If the provider refuses to act, we find nothing unfair in placing the burden of instituting legal proceedings on those seeking to discontinue treatment. Though the provider has a legal duty to adhere to the known wishes of a patient, a desire to terminate life support does not stand on the same legal footing as a patient's request for a routine change in treatment. O'Connor instructs decision-makers to "err on the side of life" and makes clear that the burden of establishing an incompetent patient's desire to die rests squarely with those who are asserting that desire. That burden does not shift simply because a family member has requested termination of life support. If the provider and the family disagree, the family may seek another facility for the patient or it may be able to take the patient into a family member's home. But if no other recourse is available, it is the family which ultimately is obliged to seek a legal determination establishing the patient's wishes. As intimates of the patient, the family members have access to the necessary evidence and are in the best position to submit it to a court for consideration.
We have no need to consider what should be the outcome in an action to recover health charges when a provider, in bad faith, refuses to discontinue treatment. None of the courts *18 below found plaintiff acted in bad faith. Considering the uncertain state of the law at the time these events occurred (see, Matter of Delio v Westchester County Med. Ctr., 129 AD2d 1) and plaintiff's willingness to help find an alternate facility once the dispute over treatment arose, the absence of any finding of bad faith cannot be said to be erroneous as a matter of law. Moreover, the reasonableness of plaintiff's position is supported by the fact that, after examining the evidence, the trial court and the Appellate Division disagreed on Mrs. Elbaum's wishes. Indeed, the continued treatment of Mrs. Elbaum was required for much of the period at issue here because plaintiff was subject to a Supreme Court order directing it to continue treatment. Under these circumstances, plaintiff did not breach its contract, and defendant was not excused from paying for his wife's care.
Finally, we conclude that defendant's counterclaims for assault and battery and punitive damages were properly dismissed.
Accordingly, the order of the Appellate Division should be affirmed, with costs, and the certified question answered in the affirmative.
HANCOCK, JR., J. (concurring).
I concur with the result and with the majority opinion. Indeed, under New York's "specific subjective intent" rule (see, Matter of Westchester County Med. Ctr. [O'Connor], 72 N.Y.2d 517, 530-531), which the parties were bound to follow, no other outcome is possible. I write separately only to express again my personal conviction (see, O'Connor, supra, at 535-539 [Hancock, Jr., J., concurring]) that "the present New York rule  requiring a factual finding of the patient's actual intent and precluding the exercise of judgment, in her best interests and on her behalf, by her physician and family, a court or guardian" (id., at 535-536) is unworkable and should receive legislative attention. There is no question that O'Connor (supra), represents the collective view of this Court and, under the rule of stare decisis, is to be followed as the law in New York. I, of course, respect that; by no means in recommending legislative change, do I cast "clouds of doubt on the reliability" (Bellacosa, J., concurring opn, at 21) of the precedent. But, speaking for myself, I believe that the Legislature should now put New York in company with the majority of States and enact legislation to change the existing rule by replacing it with some form of substituted *19 judgment or similar rule[1] (see, id., at 537-538 [Hancock, Jr., J., concurring], and, at 540-541 [Simons, J., dissenting]).
There could be few more compelling demonstrations of the need for legislative change than the history of this prolonged struggle over the continuance of gastrointestinal feeding between a nursing home and the family of an irreversibly comatose and hopelessly ill elderly woman. Had the family of Jean Elbaum, with proper medical advice and safeguards for the rights of the patient, been permitted to make the decision in 1987 that they unanimously believed would represent her choice, the patient would not have been subjected to the continuation of unwanted and purposeless medical procedures. The time-consuming and costly litigation that ends today[2] would have been avoided.
*20 As indicated in Judge Simons' opinion, a health care facility, when there is any doubt as to what the patient would have intended, cannot be faulted, under the "specific subjective intent" rule for declining "to discontinue treatment until the issue is legally determined" (majority opn, at 17). This is certainly true in cases where, as here, an Assistant District Attorney had announced that if life support were withdrawn from Mrs. Elbaum without court permission, the facility risked criminal prosecution. As aptly noted by the majority at the Appellate Division, in such a situation the facility is placed in a "Catch-22" (see, Grace Plaza v Elbaum, 183 AD2d 10, 16). If it discontinues treatment, it may be prosecuted; if its refusal to do so is held legally objectionable, it faces "loss of payments otherwise owed under contract" (id., at 16).
To be sure, the New York State Legislature, in enacting the health care agent and proxy law (see, Public Health Law art 29-C) has provided a helpful means for ensuring that an incompetent person's desire to refuse artificial life support may be effectuated. But, as has been observed:
"[W]hile it is true that the added anguish of legal uncertainty and confusion will now be removed for patients who have created a health care proxy; the law fails to provide any guidance for the families or guardians of individuals who either delay appointing an agent until it is too late or are unaware of the legal necessity for doing so. Unfortunately, in these cases, resort to the judicial system and the specific subjective intent standard it espouses will be inevitable as medical providers, fearing liability for the resulting deaths, will persist in refusing to honor the wishes of families and guardians to terminate life-sustaining procedures without prior court approval" (Note, Health Care Proxies, *21 op. cit., 57 Brooklyn L Rev 145, 176 [1991]).
BELLACOSA, J. (concurring).
I concur with Judge Simons' opinion for the Court. This case could easily be decided fully and properly in one opinion for the Court, and I would prefer to join without separate comment in that one, thorough expression of Judge Simons. Unfortunately, the separate concurrence by Judge Hancock raises a challenge that does not allow me that institutional preference and, instead, compels my separate concurrence, also, to express at least this much of a response reflecting my fundamental disagreement with his approach.
The central problem with the concurrence by Judge Hancock is its engagement of the O'Connor rule (Matter of Westchester County Med. Ctr. [O'Connor], 72 N.Y.2d 517), which is not at issue in this case. That precedent is only the backdrop to this payment-for-services dispute. Thus, to revisit O'Connor here, repudiate its holding, urge its abandonment, and claim that the instant case demonstrates that the rule is "unworkable" (O'Connor, supra, at 536 [Hancock, Jr., J., concurring]), are too bold for me. As a member of the majority of the Court that decided the O'Connor rule, I perceive no warrant for reexamination and renewed joinder of its issue, as a collateral and irrelevant offshoot of the narrow ratio decidendi of this case.
Moreover, two jurisprudentially relevant factors that have intervened since O'Connor was decided in 1988 by the full Court militate strongly against any Judge casting clouds of doubt on the reliability on any recent precedent of the Court in these circumstances. The intervening circumstances are changes in the composition of the Court (see, Simpson v Loehmann, 21 N.Y.2d 305, 314-316 [Breitel, J., concurring]) and a reduction to the bare constitutional minimum of five Judges in this case (NY Const, art VI, § 2 [a]).
A standard jurisprudential principle points to the high desirability for subordination of personal expressions by Judges to long-standing, greater and stronger institutional values. The failure to respect that principle in this case undermines the foundation stones of stare decisis, i.e., legitimacy in the public perception of transcendent institutional process, respect for the wisdom of the antecedent Judges who create precedents  after their own full, fair and robust analytical exposition of competing points of view  and avoidance of *22 persistent reexamination of such settled rules. Chief Judge Cardozo's summary on one aspect of the subject is instructive: "[T]he labor of judges would be increased almost to the breaking point if every past decision could be reopened in every case, and one could not lay one's own course of bricks on the secure foundation of the courses laid by others who had gone before" (Cardozo, The Nature of the Judicial Process, reprinted in Selected Writings of Benjamin Nathan Cardozo, at 171 [Margaret E. Hall ed 1947], see also, at 168-183).
Order affirmed, etc.
NOTES
[*] In March 1989, while the present action was on appeal, Supreme Court determined, in a separate action instituted by defendant, that there was insufficient evidence that Mrs. Elbaum wanted the feeding tube removed. On August 2, 1989 that determination was reversed by the Appellate Division. It directed that in the event the parties were unable to effectuate Mrs. Elbaum's transfer to a suitable nursing care facility which would accede to Mrs. Elbaum's wishes concerning the removal of the gastrointestinal tube within 10 days of the date of the opinion and order, the defendants were required to comply with Mrs. Elbaum's wishes (see, 148 AD2d 244). Following the Appellate Division's decision, she was discharged from Grace Plaza and died shortly, thereafter. Supreme Court ruled in favor of Mr. Elbaum in the present action on the basis of that decision sustaining Mrs. Elbaum's wishes to forego further treatment.
[1] The "specific subjective intent" rule has been widely criticized as being overly restrictive (see, e.g., Note, Health Care Proxies: New York's Attempt to Resolve the Right to Die Dilemma, 57 Brooklyn L Rev 145, 152-159 [1991]; Note, Exercising the Right to Die: A Proposal For New York, 42 Syracuse L Rev 1189, 1229-1238; Comment, In Re Storar: The Right to Die and Incompetent Patients, 43 U Pitt L Rev 1087, 1105; Note, A Patient's Last Rights  Termination of Medical Care  an Analysis of New York's In Re Storar, 46 Albany L Rev 1380; Note, In re O'Connor: Making Life-Sustaining Treatment Decisions on Behalf of Incompetent Patients in New York, 53 Albany L Rev 715 [1989]; Matter of Hier, 18 Mass App 200, 464 NE2d 959, review denied 392 Mass 1102, 465 NE2d 261; Conservatorship of Drabick, 200 Cal App 3d 185, 245 Cal Rptr 840).
[2] The litigation commenced in May 1988. Grace Plaza instituted this action (the fee action) against Mr. Elbaum for, among other things, breach of contract for his failure to pay the outstanding bill for health care services provided to his wife. A few weeks later, as his wife's conservator, Mr. Elbaum commenced an action (the injunction action) on his wife's behalf against Grace Plaza, seeking, among other things, to enjoin Grace Plaza from providing to Jean Elbaum any life-sustaining treatment, including nutrition and hydration, through artificial means.

In the spring of 1989, after conducting an extensive evidentiary hearing to determine Mrs. Elbaum's wishes, Supreme Court concluded that Mr. Elbaum had not presented sufficient evidence to demonstrate that Mrs. Elbaum, when competent, had decided not to have her life sustained by artificial means, if she were ever in an irreversibly vegetative state. Also, at about the same time, Supreme Court decided the fee action, granting summary judgment to Grace Plaza and awarding it the payment sought by an order dated June 16, 1989.
Mr. Elbaum appealed the injunction action to the Appellate Division, which, in August 1989, reversed Supreme Court's decision, finding "the evidence adduced at the hearing to be sufficiently clear and convincing to establish that * * * [Mrs. Elbaum] repeatedly indicated that she did not wish to be sustained as a `vegetable'" (Elbaum v Grace Plaza, 148 AD2d 244, 254 [Elbaum I]). The Appellate Division granted the injunction, permitting the removal of Mrs. Elbaum's feeding tube. Grace Plaza applied to the Appellate Division for a stay of the injunction and for leave to appeal to the Court of Appeals, both of which motions were denied on August 21, 1989. Jean Elbaum was transferred to another facility, her feeding tube was removed and she died thereafter.
Elbaum I prompted the Supreme Court to reverse itself in the fee action to the extent of dismissing Grace Plaza's complaint for payment. The order of dismissal was entered in February 1990. Grace Plaza appealed, and in September 1992 the Appellate Division vacated the 1990 dismissal order, reinstated Grace Plaza's complaint and adhered to the June 1989 order, awarding Grace Plaza payment for health services to Jean Elbaum. Mr. Elbaum appealed the order to pay for life-sustaining measures that the Appellate Division had ruled were not what Mrs. Elbaum would have wanted.