10

GRACE PLAZA OF GREAT NECK, INC., Appellant-Respondent, v
MURRAY ELBAUM, Respondent-Appellant.

Second Department, September 21, 1992

## APPEARANCES OF COUNSEL

*Proskauer Rose Goetz & Mendelsohn,* New York *(Steven E. Obus, Larry M. Lavinsky, Betsy A. Rosen* and *Bruce E. Loren* of counsel), for appellant-respondent.

*Joseph D. Pope,* New York, for respondent-appellant.

*James Bopp, Jr., Thomas J. Marzen* and *Deborah Hall Gardner,* Indianapolis, for Counsel for the Ethics and Advocacy Task Force of the Nursing Home Action Group, *amicus curiae.*

*Susan C. Waltman,* New York, for Greater New York Hospital Association, *amicus curiae.*

*M. Rose Gasner,* New York, for Society for the Right to Die, Inc., and *Fennella Rouse,* New York, for Concern for Dying, *amici curiae.* (One brief filed.)

*Meyer, Suozzi, English & Klein, P. C.,* Mineola *(Michael A. Ciaffa* and *David A. Smith* of counsel), for Coalition of Institutionalized Aged and Disabled, Inc., and others, *amici curiae.* (One brief filed.)

*Melinda Aikins Bass,* White Plains, for Nassau County Health Facilities Association, *amicus curiae.*

*O'Connell & Aronowitz,* Albany *(Cornelius D. Murray, Sarah W. Birn* and *David M. Cherubin* of counsel), for New York State Health Facilities Association, Inc., *amicus curiae.*

## OPINION OF THE COURT

BRACKEN, J.

The Supreme Court held that a health care facility which provides life-saving medical treatment to an incompetent patient in accordance with the orders of the patient's attending physician, but over the objections of the patient's conservator, forfeits the fees to which it would otherwise be entitled as a matter of contract, at least where the conservator in question claims to know what the patient's own wishes would be

regarding the administration of life-saving medical treatment. We believe that this holding is erroneous as a matter of law. It does nothing to advance the right of incompetent persons to refuse medical treatment, but instead exalts the "right" of surrogate decision makers, without any written authorization from the patient, to dictate what kind of medical treatment an incompetent patient should receive. New York law does not recognize such a "right". Instead New York law denies to all persons, whether family members or not, the right to decide when another person should die (see, *Matter of Westchester County Med. Ctr. [O'Connor]*, 72 NY2d 517; *Matter of Storar*, 52 NY2d 363, *cert denied* 454 US 858). For these reasons, we conclude that the order must be reversed insofar as appealed from.

In September 1986 the plaintiff nursing home agreed to provide certain services to Jean Elbaum, an unconscious patient who could not survive without artificial nutrition and hydration, on condition that the defendant Murray Elbaum pay for the services. Mrs. Elbaum had never executed a living will.[1] Mr. Elbaum entered into this contract knowing that the services to be provided by the plaintiff would include the maintenance of a gastrointestinal feeding tube which had already been inserted at North Shore Hospital.

In October 1987 Mr. Elbaum demanded the cessation of nutrition and hydration, claiming that Mrs. Elbaum would have made a like demand, if she had been able to do so. Responding that there was no "clear indication" of Mrs. Elbaum's desires in this respect, and also asserting that its own ethical standards would, in any event, prohibit it from withdrawing life-saving medical treatment from one of its patients, the plaintiff refused to comply with Mr. Elbaum's demand and encouraged him to transfer Mrs. Elbaum to another, presumably more compliant, nursing home.

Mr. Elbaum's response was to breach his contract by refusing to pay for any of the services which were thereafter

---

1. Public Health Law article 29-C, which is "intended to establish a decision-making process to allow competent adults to appoint an agent to decide about health care treatment in the event they lose decision-making capacity" (L 1990, ch 752, § 1) had not yet been enacted at the time the present dispute arose. Thus, the plaintiff nursing home could not benefit from the grant of immunity from civil or criminal liability which that legislation confers upon those health care professionals who withdraw life support from incapacitated patients in "good faith" reliance on the directions of a health care agent (see, Public Health Law § 2986 [1]).

rendered by the plaintiff, including those services needed to save Jean Elbaum's life; the record does not reveal any effort on his part to locate an alternative nursing home. Efforts made by the plaintiff to locate another facility were fruitless; those facilities which were contacted "would not admit the patient for the purpose of removing the tube".

To uphold the decision of the Supreme Court, we would have to promulgate a new rule of law: that health care providers must withdraw life support from their incapacitated patients, even in the absence of court authorization, whenever the incapacitated patient's personal representative, claiming to act in the name of the patient's own "right to die", demands the withdrawal of life support. This rule would obviate the need for any judicial intervention for the purpose of defining what the wishes of an incapacitated patient actually *are* by attaching a presumption of infallibility to the conservator's *opinion* as to the nature of those wishes, thus making the conservator the final arbiter of the conservatee's life or death. While this rule may one day become part of the law in this State, if certain proposals are ever enacted into law,[2] it is not the law now, nor was it the law at the time of the events herein.

The defendant Murray Elbaum argues that he rightfully refused to pay the plaintiff nursing home for the services it was rendering to his wife, Jean Elbaum, pursuant to its contract with him. He contends that as soon as he informed the plaintiff of his belief that Jean Elbaum, if able to do so, would have refused nutrition and hydration, the plaintiff should have withdrawn nutrition and hydration, and should have consequently caused its patient's death, even in the absence of a court order. Mr. Elbaum also argues, in support of his counterclaims, that in continuing to furnish nutrition and hydration to Mrs. Elbaum, the plaintiff committed a battery.

---

2. The New York State Task Force on Life and the Law has recommended amending the law so as to confer upon an incapacitated person's "family" (a term which, depending on the case, is defined so as to mean a spouse, a parent, an adult son or daughter, or a "close friend") the right to authorize the cessation of life-saving medical treatment. Pursuant to the recommendations made by this Task Force, the patient's "family" would be empowered to direct the cessation of life support only if (1) a "bioethics" committee of the patient's hospital or nursing facility approves, (2) the patient is permanently unconscious, (3) the patient is terminally ill, *or* (4) a court order is obtained (*see, New Law on Medical Treatment Decisions Urged by Task Force,* NYLJ, Mar. 24, 1992, at 1, col 1).

Mr. Elbaum contends, and our dissenting colleague agrees, that our decision in *Elbaum v Grace Plaza* (148 AD2d 244) is dispositive of these arguments, because the text of our decision in that case contains statements to the effect that the plaintiff's services were "undesired". It is true that this is precisely what our Court found. In holding that, if competent, Jean Elbaum would have refused nutrition and hydration, we concluded that the plaintiff's furnishing of such services was, as a matter of fact, "undesired" by her. What we obviously did *not* hold, however, is that the plaintiff acted wrongfully in keeping Mrs. Elbaum alive until the actual nature of her desires had in fact been proved.

Mr. Elbaum argues that because, in 1989, this Court found that Mrs. Elbaum would, if able, refuse the life-saving treatment offered to her, the plaintiff nursing home should have known, in 1987, that those were in fact Mrs. Elbaum's wishes. This argument attributes to the plaintiff not only the power to see into the mind of a comatose patient, but the power to see into the minds of the members of an appellate court which, as of 1987, was not to be convened for another two years. Clearly, the plaintiff at no point *knew* Mrs. Elbaum's wishes, nor could it ever have known anything more than Mr. Elbaum's view as to what those wishes were. The rule which prevents physicians from recovering payment for medical services which are not desired *(e.g., Shapira v United Med. Serv.,* 15 NY2d 200) should not be applied in a case where, because the patient is comatose, her desires cannot be known, but can only be deduced, with a greater or lesser degree of certainty, from evidence of her past conduct and past statements.

In *Matter of Eichner (Fox)* (73 AD2d 431, 450, *mod on other grounds* 52 NY2d 363), this Court stated that a physician who, without court authorization, deliberately causes the death of a "vegetative" patient, could face criminal prosecution for homicide (citing Penal Law §§ 120.30, 125.00, 125.15 [3]; § 125.25 [1] [b]; 2 Wharton, Criminal Law § 137 [14th ed]; *Repouille v United States,* 165 F2d 152, 153-154; *see also, In re President & Dirs. of Georgetown Coll.,* 331 F2d 1000, at 1009, n 18, *cert denied* 377 US 978; *Jones v United States,* 308 F2d 307; *Payne v Marion Gen. Hosp.,* 549 NE2d 1043 [Ind App]; *People v Roberts,* 211 Mich 187, 178 NW 690; *cf., Barber v Superior Ct.,* 147 Cal App 3d 1006, 195 Cal Rptr 484; Annotation, *Homicide —Physician's Withdrawal of Life Supports from Comatose Patient,* 47 ALR4th 18; Comment, *The Crime of Aiding a*

*Suicide,* 30 Yale LJ 408 [discussing *People v Roberts, supra]).* In modifying our decision in *Matter of Eichner (supra),* the Court of Appeals did not disagree with this assertion, and stated that physicians who engage in such conduct "act at their peril" unless prior judicial approval is obtained *(Matter of Storar,* 52 NY2d 363, 382, *supra),* thus reaffirming the rule that passively causing death can constitute criminal homicide *(see, People v McDonald,* 49 Hun 67 [no defense that infant's death by starvation resulted from inaction]; *see also, People v Phillips,* 64 Cal 2d 574, 414 P2d 353 [doctor liable for murder based on advice to patient to forego life-saving surgery]). Mr. Elbaum now contends that the plaintiff acted "at its peril" not because it was *willing* to withdraw life support from an incompetent patient without court permission, but because it *refused* to withdraw life support from an incompetent patient without court permission. We cannot accept this argument.

New York at present expressly rejects any form of surrogate decision-making in "right to die" cases because such an approach would be "inconsistent with our fundamental commitment to the notion that no person or court should substitute its judgment as to what would be an acceptable quality of life for another" *(Matter of Westchester County Med. Ctr. [O'Connor], supra,* at 530; *see, People v Eulo,* 63 NY2d 341, 357; *Matter of Storar, supra; see also, Cruzan v Harmon,* 760 SW2d 408 [Mo], *affd sub nom. Cruzan v Director, Mo. Dept. of Health,* 497 US 261). New York requires that incompetent patients be given adequate hydration and nutrition *(see,* 10 NYCRR former 416.3; 10 NYCRR 415.12 [i], [j]; *see also,* Public Health Law § 2803-c [3] [e]; NYS Dept of Health Mem 89-24 [Oct. 20, 1989]; 42 CFR 483.25 [j]). New York provides for civil, administrative, and, as noted above, even criminal penalties for any health-care professional who violates these obligations without court approval *(see,* Public Health Law § 2801-d; *see also,* Public Health Law §§ 12, 12-b, 16; 10 NYCRR 81.7 [b]; *People v Flushing Hosp. & Med. Ctr.,* 122 Misc 2d 260). The legal obligation to provide adequate nutrition and hydration to such patients ceases only after a "trier of fact [has been persuaded] that the patient held a firm and settled commitment to the termination of life supports under the circumstances like those presented" *(Matter of Westchester County Med. Ctr. [O'Connor], supra,* at 531; *see also, Matter of Wickel v Spellman,* 159 AD2d 576; *Elbaum v Grace Plaza,* 148 AD2d 244, *supra; Matter of Delio v Westchester County Med. Ctr.,* 129 AD2d 1).

That the State, through its various agencies, in fact threatens to impose administrative, civil, and even criminal sanctions on those physicians who withdraw life support from incompetent patients without court permission was made particularly evident in the present case when an Assistant District Attorney, representing the People of the State, expressly told the court that if the plaintiff had withdrawn life support from Mrs. Elbaum without court permission, it "would have faced the prospect of criminal sanction including a Grand Jury inquest, possibly an indictment, a trial and a conviction". The State should not be allowed to threaten that such legal sanctions may be imposed on a physician who withdraws life support without court permission, on the one hand, while at the same time threatening to impose sanctions (loss of payments otherwise owed under contract; liability for battery) on a physician who waits for court permission before withdrawing life support, on the other. Several commentators have already warned that, as the law develops in this sensitive area, the courts should be careful to avoid creating such "Catch-22" situations (see, Oddi, *The Tort of Interference with the Right to Die: The Wrongful Living Cause of Action,* 75 Geo LJ 625, nn 51-53; Grant, Cleave, *A Line Less Reasonable: Cruzan and the Looming Debate Over Euthanasia,* 2 Md J Contemp Legal Issues 99; see also, Rosenblum, Forsythe, *The Right to Assisted Suicide: Protection of Autonomy, or an Open Door to Social Killing?* 6 Issues in L & Med 3).

Our dissenting colleague's claims are not only unprecedented in New York, but have scant support even in those States which have adopted the "substituted judgment" rule, and thus allow for various kinds of surrogate decision-making (e.g., *Matter of Jobes,* 108 NJ 394, 529 A2d 434; *Brophy v New England Sinai Hosp.,* 398 Mass 417, 497 NE2d 626; *Conservatorship of Drabick,* 200 Cal App 3d 185, 245 Cal Rptr 840). Even in these States, in which the right to die is broader than in New York, "the law will not require the medical profession to yield to private demands of surrogate decision makers" (*Westhart v Mule,* 213 Cal App 3d 542, 261 Cal Rptr 640, 646 [Crosby, Acting P. J., concurring] [depublished]). It has also been held, in these other jurisdictions, that no medical professional may be compelled to violate his own medical ethics by being forced to remove a feeding tube from an incompetent patient, unless the patient's conservator proves the total unavailability of any physician willing to do so (see, *Brophy v New England Sinai Hosp., supra; Conservatorship of Morrison,*

206 Cal App 3d 304, 307, 253 Cal Rptr 530). In some of these States, it has been held that no cause of action for battery may be maintained against a medical professional who continues to provide treatment to a patient over the objections of the patient's family *(see, McVey v Englewood Hosp. Assn.,* 216 NJ Super 502, 524 A2d 450; *see also, Werth v Taylor,* 190 Mich App 141, 475 NW2d 426 [consent to life-savings treatment presumed, notwithstanding objections of an unconscious patient's representative]; *Benoy v Simons,* 66 Wash App 56, 831 P2d 167; *Bartling v Glendale Adventist Med. Ctr.,* 184 Cal App 3d 961, 229 Cal Rptr 360; *cf., Estate of Leach v Shapiro,* 13 Ohio App 3d 393, 469 NE 2d 1047; *Young v Oakland Gen. Hosp.,* 175 Mich App 132, 437 NW2d 321).

It is important to recall that in *Elbaum v Grace Plaza (supra,* at 256-257), this Court held not only that Jean Elbaum had the right to have her feeding tube removed, but also that the plaintiff had no duty to participate in the removal of that tube in violation of its own medical-ethical judgment. Instead, the Court held that, in the event that no other nursing home facility would admit Mrs. Elbaum, the plaintiff would have to allow a physician retained by Mr. Elbaum to enter its premises in order to remove the tube. This aspect of our *Elbaum* decision is fully consistent with *Matter of Delio v Westchester County Med. Ctr. (supra)* and other cases *(e.g., Brophy v New England Sinai Hosp., supra)* which hold that medical professionals should not be compelled by the State to engage in conduct which they themselves consider unethical. A patient who wishes to abstain from life-saving medical treatment may have the right to do so, but has no right to force a physician to assist, actively or passively, in what the physician himself might regard as the equivalent of suicide.

In the present case, we cannot fault the plaintiff for asserting its right to refrain from engaging in conduct which it considered unethical. Its ethical position is not idiosyncratic within the medical community *(see, e.g.,* Grisez, *Should Nutrition and Hydration be Provided to Permanently Unconscious and Other Mentally Disabled Persons,* 5 Issues in L & Med 165; May, *Feeding and Hydrating the Permanently Unconscious and Other Vulnerable Persons,* 3 Issues in L & Med 203). It did nothing to impede Mrs. Elbaum's transfer to another facility; instead, it actively sought to expedite that process. The apparent unwillingness of other facilities to admit Mrs. Elbaum for the sole purpose of removing her feeding tube can only be attributed to the fact that it was

widely considered improper to engage in such life-terminating conduct without court authorization. In the absence of proof to the contrary, we can only presume that once court authorization had been obtained in *Elbaum v Grace Plaza (supra),* a facility willing to admit Mrs. Elbaum for the purpose of removing the tube was located without apparent difficulty. The plaintiff should not be held to have acted wrongfully when it refused to do the very thing (removal of life support without court permission) which no other comparable medical facility was willing to do.

In light of the foregoing, the defendant's argument in the present case rests not so much on the proposition that Jean Elbaum had the right to die as on the proposition that the plaintiff and Dr. Corn had an absolute duty to put aside their own ethical scruples, as well as their fear of criminal prosecution, to assist her in the exercise of that right. Consistent with this position, Mr. Elbaum argues on appeal that a "requirement that patients be removed from non-complying nursing homes * * * would chill the exercise of [their] fundamental right to control [their] own medical treatment". In other words, patients (competent or incompetent) bent on exercising their "right to die" should be spared the inconvenience of finding a compliant physician: all health care providers should be legally obligated to assist in bringing about the patient's death and nursing homes should be required to do so, even without the approval of the patient's physician. We cannot accept this argument. While we recognize the right of a patient to control the course of his or her treatment, we do not recognize any right to force a health care provider to render treatment which is contrary to his or her own conscience.

Our dissenting colleague makes a crucial finding of fact based on a proposition which we regard as wholly speculative, i.e., that Mrs. Elbaum's wishes were at all times known to the plaintiff. According to the dissent, the plaintiff was "undeniably heedless of [Mrs. Elbaum's] wishes", and acted "in violation of her clearly declared wishes". We see no basis in the record for making this finding of fact.

We consider it an exercise in futility, both as a matter of law and as a matter of science, to enter into a debate as to whether the plaintiff "knew" what Mrs. Elbaum wanted. No one had that knowledge. A more accurate way to frame the question is this: whether the plaintiff knew, or could have known, that the defendant, Mr. Elbaum, had within his con-

trol enough evidence to meet the "clear and convincing" standard of proof, and thus satisfy a court of law that Mrs. Elbaum wanted to die. To state, as the dissent apparently does, that the plaintiff should have had such knowledge, is to say that the decisions of New York courts in "right to die" cases are always perfectly predictable, and that the plaintiff should have known, in 1987, how this Court, in 1989, would ultimately decide the case of *Elbaum v Grace Plaza (supra).*

The dissent states that our decision in *Elbaum v Grace Plaza (supra)* is dispositive of all the issues now being raised on this appeal. The only similarity between the present case and *Elbaum v Grace Plaza (supra)* is that they involve the same parties: the issues brought up for review in the two cases are completely different. Whether Mrs. Elbaum had the right to die is one issue. Whether the plaintiff committed a battery or forfeited its contractual rights because it refused to assist Mrs. Elbaum in the exercise of this right, in the absence of judicial guidance, and in violation of its own ethics, is another, entirely different, issue.

Much is made of the fact that Dr. Corn testified that he would not remove artificial nutrition or hydration from a patient, even under court order. There never has been a court order issued in this State commanding a particular physician to do an act which is directly contrary to the physician's own medical ethics; in fact, our decisions in *Elbaum v Grace Plaza (supra)* and *Matter of Delio v Westchester County Med. Ctr. (supra)* hold that such an order would be erroneous. Thus, while Dr. Corn's expressed willingness to suffer the penalties of contempt rather than compromise on an issue of conscience might provoke either admiration or indignation, depending on one's point of view, the fact remains that his attitude in this regard is totally irrelevant.

The dissent places great weight on a letter from the plaintiff dated February 16, 1988, wherein the plaintiff took the position that it would not be willing to remove Mrs. Elbaum's feeding tube even if evidence of her wishes were forthcoming. What the dissent overlooks is that our decision in *Elbaum v Grace Plaza (supra)* essentially confirmed the plaintiff's view that it had a legal right to abide by its own ethical standards.

It is asserted that, in light of our decision today, all health care providers in charge of competent patients will have an additional financial incentive to prolong the lives of such patients over the objections of the patients' families. This may

be true, and the potential evil which we see is that some beleaguered families may, regrettably, be forced to resort to litigation, although we believe that the dissent overdramatizes the extent to which this might place a burden on the judicial system. What is not noted is that, if Mr. Elbaum's conduct in this case were condoned, health care providers would have an additional financial incentive to obey, without question, the orders of those conservators who might prematurely despair of their conservatee's recovery, or the orders of those conservators whose judgment might be tainted by motives less altruistic than Mr. Elbaum's. The potential evil we see resulting from this, i.e., the possible death of even one patient whose life might have been saved, is infinitely greater, in our view.

We therefore hold that, under the law as it stood at the time this case arose, the plaintiff committed no legal wrong, incurred no legal liability, and forfeited no legal right, when, in the absence of judicial guidance, it continued to provide life-saving medical treatment to a comatose patient over the objections of the patient's conservator. If there are any reasons why this case should fall outside the scope of this rule, neither the Supreme Court nor our dissenting colleague has explained them to our satisfaction.

For these reasons, the order appealed from is reversed insofar as appealed from, on the law, the original determination in the order entered June 16, 1989, denying that branch of the defendant's cross motion which was for summary judgment dismissing the complaint is reinstated, the plaintiff is granted partial summary judgment as to liability for services rendered to Jean Elbaum, and the matter is remitted to the Supreme Court, Nassau County, for an assessment of damages.

Further, the order is affirmed insofar as cross-appealed from. The Supreme Court properly dismissed the defendant's counterclaims. The actions of Dr. Corn and of the plaintiff did not constitute a battery *(see, McVey v Englewood Hosp. Assn.,* 216 NJ Super 502, 524 A2d 450, *supra).* We need not pass on whether this claim is barred by the doctrine of claim preclusion.

ROSENBLATT, J. (dissenting). I dissent, because the majority's decision enables nursing homes to carry out their own policies regarding the prolongation of artificial life support, even if those policies are founded on motives and interests that are diametrically opposed to the wishes of patient.

At the outset, the majority casts the case as one involving a nursing home caught between the orders of a life-saving attending physician and the opposing desires of a conservator. I see the central issue differently, considering that the nursing home and its attending physician/medical director were concededly synonymous, and that the nursing home artificially prolonged the life of an irreversibly vegetative patient, undeniably heedless of *her* wishes. In an earlier decision relating to this case *(Elbaum v Grace Plaza,* 148 AD2d 244, which I shall refer to as *Elbaum I),* we found that the persistence of the plaintiff Grace Plaza of Great Neck, Inc. (hereinafter Grace Plaza) in administering artificial life support to her was unwarranted and in violation of *her* clearly declared wishes, and we ordered it stopped. It was, and that behind us, the question is whether Grace Plaza is entitled to its fees for the interim period. I would conclude that it is not. I appreciate that there are and should be ethical considerations on the part of health care providers when asked to act exclusively on the wishes of third parties, with no guidance from the judiciary or the patient. But that, in my view, is not the case before us.

Grace Plaza is on record as having discounted utterly the patient's wishes to die naturally, proclaiming itself to be the transcendent arbiter of the patient's artificial life support. Its intransigence was so extreme that it stated, through its Medical Director, Dr. Lester Corn, that it would not permit an independent physician to remove the feeding tube, even if a court were to order the removal. Its actions underscore the enormous burdens placed on patients and their already beleaguered families who are compelled to combat a nursing home's stance on life support—a stance our Court has found to be unjustified.

Although the majority does not say so in so many words, the opinion seems to invoke a rule of law by which, with no recourse to a patient's wishes, a court order is to be required before artificial life support may be discontinued when a patient is in a permanent, irreversible vegetative state.

In my view, such a rule is not supported by the decisional law rendered by the Court of Appeals. Moreover, it allows a nursing home to profit financially, while ignoring a patient's wishes, as it imposes its own ethical standards upon her. Grace Plaza sought neither judicial intervention nor guidance for what it now characterizes as its dilemma. It sought only

payment, while tenaciously refusing to consider anything that Jean Elbaum said regarding her wish to die free of artificial life support.

I am not advocating that this case be governed by a rule of "substituted judgment" or that a "surrogate's" wishes should be considered controlling in this case. The Supreme Court, in the order appealed from, did not base its determination on that concept, nor in *Elbaum I* did we rely on that doctrine when we rejected Grace Plaza's claims. We concluded in *Elbaum I* that it was the *patient,* Jean Elbaum, who had clearly and convincingly expressed her wishes to be free of artificial life support. That is not a matter of speculation but a finding of fact that this Court made.

Moreover, I do not think that it is necessary to invoke the rule of surrogate decision-making or substituted judgment in order to address Grace Plaza's claims. Those claims were addressed and repudiated by this Court in *Elbaum I,* and I cannot reconcile today's decision with what our Court said so compellingly in *Elbaum I.*

In *Elbaum I,* Murray Elbaum, as conservator, sought to restrain Grace Plaza from continuing to keep Jean Elbaum alive by means of a gastrointestinal feeding tube or any other artificial means. Asserting that it was unwilling to compromise its ethical integrity and that of the medical profession, Grace Plaza refused to honor Murray Elbaum's directives as to Jean Elbaum's wishes that she be allowed to die naturally. Consequently, Murray Elbaum refused to continue payment.

The Supreme Court decided both the injunction action, *Elbaum I,* and the fee action before us (hereinafter *Elbaum II)* in spring of 1989. By judgment entered May 3, 1989, the Supreme Court denied Murray Elbaum's request for an injunction and dismissed his complaint in *Elbaum I.* By order entered June 16, 1989, the Supreme Court granted summary judgment to Grace Plaza in *Elbaum II,* the fee action now on appeal before us.

Seven weeks later, in *Elbaum I,* we reversed the judgment of the Supreme Court *(see, Elbaum v Grace Plaza,* 148 AD2d 244, *supra* [decided Aug. 2, 1989]). We found, by clear and convincing proof, that when she was competent, Jean Elbaum made a firm and settled decision to decline nutrition and hydration through a gastrointestinal tube, should she reach an irreversible, persistent, vegetative state. We further held that Grace Plaza had no basis to override Jean Elbaum's

wishes. Nowhere in *Elbaum I* did we suggest that we agreed with any of the findings of the trial court. On the contrary, we declared them erroneous, and to effectuate Jean Elbaum's wishes, we granted an injunction directing that Grace Plaza assist in the removal of Jean Elbaum's gastrointestinal tube, permit a physician selected by the Elbaum family to do so, or effectuate her transfer to a facility that would do so.

Following our decision in *Elbaum I,* Grace Plaza applied to this Court for a stay of enforcement, and for leave to appeal to the Court of Appeals. On August 21, 1989, we denied both applications. Thereafter, the feeding tube was removed and Jean Elbaum died.

Our decision in *Elbaum I* prompted the Supreme Court to reverse itself, "upon reargument and renewal" to the extent of dismissing Grace Plaza's complaint for payment in *Elbaum II.* That order of dismissal, entered February 6, 1990, is the subject of this appeal.

In deciding whether Grace Plaza is entitled to compensation, the findings that we made and set forth at length in *Elbaum I* provide a factual framework. In *Elbaum I,* using the standard enunciated in *Matter of Westchester County Med. Ctr. (O'Connor)* (72 NY2d 517), we narrowed our inquiry to the interpretation of Jean Elbaum's "expressed intent" *(Elbaum v Grace Plaza, supra,* at 252, quoting *Matter of Westchester County Med. Ctr. [O'Connor], supra,* at 530). We found that Jean Elbaum, "while competent, repeatedly extracted a series of promises from her husband and family members", that reflected a resolve and purpose weighty enough to constitute "solemn pronouncements" as to her desire that "she did not wish to be sustained as a 'vegetable' ", and that no artificial feeding tubes be used to prolong her life if she reached such a condition *(Elbaum v Grace Plaza, supra,* at 253-254). We further found that Murray Elbaum told Grace Plaza authorities "on at least 6 to 12 different occasions, *of his wife's wishes* with respect to the nonuse of respirators, tubes and antibiotics". We found that on those occasions "Mr. Elbaum advised Dr. Corn [Grace Plaza's Medical Director] that *his wife had expressly stated* that she would not want the use of feeding tubes if she were in an irreversible vegetative state" *(Elbaum v Grace Plaza, supra,* at 248 [emphasis added]). Further, we found that Grace Plaza and its administration "ignored Mr. Elbaum's demands while simultaneously insisting upon payment for their undesired services" *(Elbaum v Grace Plaza, supra,* at 255). Although it was Murray Elbaum who conveyed

Jean Elbaum's wishes, Grace Plaza stated that it would not act on those wishes even if it had irrefutable evidence of her wishes. This is not surrogacy or substituted judgment. Grace Plaza, we held, was rejecting the *patient's* wishes.

In support of its claim for payment, Grace Plaza argues that it provided services to maintain Jean Elbaum's life amid factual and legal uncertainty, and that under the circumstances it should not be penalized financially for acting in furtherance of the State's policy of preserving life. Grace Plaza asserts that given these now alleged doubts, it should not be denied payment for its efforts to sustain Jean Elbaum's life until a court dispelled the doubts.

### I

### FACTUAL "UNCERTAINTY"

I am unpersuaded by Grace Plaza's contention that it should be compensated for prolonging Jean Elbaum's life during a period of "doubt" as to her wishes, or that to deny payment we must ascribe to Grace Plaza the ability to read the mind of a comatose patient or an appellate court. Grace Plaza made it clear that as long as Jean Elbaum remained at Grace Plaza it would continue indefinitely to render artificial life support services to her, heedless to any protest that conveyed her wish to die naturally. Throughout the dispute, Grace Plaza took the implacable position that its own policy of refusing to discontinue life support was superior to Jean Elbaum's desires, no matter how irrefutably expressed. Indeed, during the hearing before the Supreme Court, Grace Plaza made the further telling and remarkable assertion underscoring its belief that Jean Elbaum's wishes are completely beside the point: Grace Plaza stated that it "takes no position in this proceeding with regard to the wishes of Jean Elbaum as far as her treatment is concerned". Although it now seeks compensation and raises "doubts" as to Jean Elbaum's wishes to be freed from artificial life supports, its actions during the dispute negate any reliance on her wishes and any doubts in that regard. Grace Plaza's stance was based entirely on its own criteria, to which it derogated its patient's rights.

The majority states that Grace Plaza did not unilaterally dictate the course of Jean Elbaum's treatment because the treatment was in accordance with Dr. Corn's directions. I disagree. On the question of Jean Elbaum's treatment there is

no doubt that Dr. Corn and Grace Plaza were one and the same, and I do not see that Grace Plaza is or can be claiming otherwise. As we found in *Elbaum I,* Dr. Corn, as the director and medical head of Grace Plaza, had the authority to determine Grace Plaza's position as to continuation of life support, and he acted accordingly.

In this respect, Dr. Corn testified that he considered *himself* "the final arbiter" of the treatment Jean Elbaum was to receive at Grace Plaza. He further testified that he would not disconnect her from a feeding tube because to do so would be condemning a patient "to death, which is in essence contrary to the dedications of medicine which is the preservation of life and not the discontinuance of life". He took the position that even if he knew that Jean Elbaum wanted the feeding tube removed, he would not allow it even if it were to be done by someone else independent of Grace Plaza. At the hearing, the court asked him "If the court were to order the discontinuance of the feeding tube, would you allow a physician who met your standards to come in and to discontinue that tube or remove the tube? Yes or No?" His answer was "No". In seeking compensation for services rendered under these circumstances, Grace Plaza may not minimize, or characterize, the sworn statements of Dr. Corn as anything less than an accurate reflection of Grace Plaza's policy, throughout.

In a letter dated October 9, 1987, Dr. Corn told Murray Elbaum that "State law prohibits us from allowing a patient to die as a consequence of withholding fluid and malnourishment *[sic]*", that "[t]he practice of medicine is dedicated to the preservation of life", and that Mr. Elbaum's wishes "are contrary to this dedication, to the law and to the policies and philosophy of Grace Plaza". After Murray Elbaum had retained counsel in furtherance of Jean Elbaum's desire to die naturally, Grace Plaza's administrator, Celia Strow, wrote to Murray Elbaum in a letter dated February 16, 1988, invoking Grace Plaza's overriding interest in continuing life support, irrespective of the patient's wishes. Ms. Strow wrote as follows:

"Dear Mr. Elbaum:

"Your attorney has advised us that you and your family desire to suspend the feeding of your wife by gastrostomy tube. At this time, we have not been provided with clear indication of the patient's wishes at a time when she was competent. However, please be aware that *even if irrefutable*

*evidence of the patient's wishes were forthcoming, Grace Plaza is not willing to undertake removal of the gastrostomy tube, and we believe that we have the right under New York State law to refuse to do so.* The goal of this facility is to preserve life, and we will not willingly take actions inconsistent with this position. Pursuant to conversations between your attorney and ours, we have attempted to find another facility which would accommodate you, but we have been unsuccessful. However, we remain willing to assist you with Mrs. Elbaum's transfer to any facility you name, or to your home where Mrs. Elbaum's needs can be met by appropriate home care.

"In the interim, and for the duration of her stay here, we expect payment as per the admissions contract. At this point, you are in arrears for the months of November 1987 through February 1988. If payment in the amount of $18,576 is not received within 10 days of receipt of this letter, we will be forced to initiate actions for recovery of these funds, and delivery of the patient to your care. You may be aware that New York State regulation sanctions the discharge of a patient for non-payment.

"We hope that we will be able to avoid controversy in what we understand is a painful and unfortunate situation, and stand ready to discuss appropriate transfer arrangements with you. However, we must insist upon payment of our charges at this time". (Emphasis supplied.)

My colleagues in the majority emphasize the portion of the February 16, 1988, letter in which Grace Plaza offers to assist in transferring the patient. On this record, I would find that offer to be little more than hollow, and certainly not pivotal. It is unrealistic to expect another nursing home to easily accept a patient for the sole and limited purpose of discontinuing life support, and certainly Grace Plaza could not have seriously expected otherwise. Grace Plaza knew that Jean Elbaum was there to stay, and, as we found in *Elbaum I (Elbaum v Grace Plaza, supra,* at 256, n) Murray Elbaum could not bring her home. In spite of those conditions, Grace Plaza's position was so uncooperative and of such conceit that its Medical Director stated under oath that he would not allow an independent physician on its property to discontinue life support, even if a court ordered it. Moreover, we do not know whether Jean Elbaum was even transferred to another nursing home or whether Grace Plaza itself discontinued the feeding, or if another doctor from outside the facility did so.

In addition to now raising doubts about Jean Elbaum's wish to expire naturally, Grace Plaza further argues that it was not clear that she wanted to die the kind of death that would result from the discontinuance of nourishment and hydration. Apart from our observation in *Elbaum I* that Grace Plaza was not in the least moved or motivated by Jean Elbaum's wishes, I find this argument unconvincing. In *Matter of Delio v Westchester County Med. Ctr.* (129 AD2d 1, 16-17), we held that discontinuation of life support systems does not depend on the type of treatment that is to be discontinued, and that we, like other States, have "refused to differentiate between the various artificial devices available to sustain the life of a patient in a persistent vegetative state" (see, *Position of the American Academy of Neurology on Certain Aspects of the Care and Management of the Persistent Vegetative State Patient*, 39 Neurology 125 [Jan. 1989]).

In expressing its position, by letter, testimony, and actions, Grace Plaza defiantly and improperly refused to consider Jean Elbaum's comprehensive pronouncements and right of self-determination. I would hold that on this record Grace Plaza may not now assign factual doubt as to Jean Elbaum's clearly expressed wishes, and then seek compensation from the patient after ignoring those wishes.

## II

### LEGAL "UNCERTAINTY"

In seeking to justify its claim for payment Grace Plaza also contends that it was beset by legal uncertainties, prompting it to take the "cautious" legal approach by prolonging Jean Elbaum's life. Grace Plaza's actions, however, and the law existing then and now, should defeat its claim. Not only did Grace Plaza assert that Jean Elbaum's wishes, whatever they were, must yield to its own philosophy and policy, but that Grace Plaza had a "right under New York State law" to refuse to undertake removal of the feeding tube. Dr. Corn, as we have seen, wrote that "State law prohibits us from allowing a patient to die as a consequence of withholding fluid and malnourishment *[sic]*". This was not an expression of uncertainty as to Grace Plaza's legal constraints; it was a direct statement of law and an incorrect one. Dr. Corn, in reliance on the "law," acknowledged that he did not seek legal advice before writing the letter. His legal stance was unsupported by any existing New York decision or statute, and was flatly at

odds with our then-existing holding in *Matter of Delio v Westchester County Med. Ctr.* (129 AD2d 1, *supra)* that the patient's right to decline medical treatment encompasses the right to have hydration and nutrition discontinued when the patient is in a persistent vegetative state with no hope of recovery.[1] I cannot accept Grace Plaza's suggestion that *Delio,* which authorized discontinuance of feeding tube support for a hospital patient, is distinguishable from cases involving nursing home patients.

I also find no merit in any distinction offered by Grace Plaza between patients who are competent when declining medical treatment and those who were competent when they made their wishes known but were not competent when the issue ripened *(see generally,* Annotation, *Judicial Power to Order Discontinuance of Life-Sustaining Treatment,* 48 ALR4th 67).

Seventy-nine years ago, in *Schloendorff v Society of N. Y. Hosp.* (211 NY 125, 129), the Court of Appeals stated that "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body". This view reflected even earlier pronouncements, no less eloquent, that "[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law" *(Union Pac. Ry. Co. v Botsford,* 141 US 250, 251).

The concept of the sanctity of the person was recognized again in *Matter of Storar* (52 NY2d 363, *cert denied* 454 US

---

1. In describing the decisional landscape that existed at about the time of this dispute, the United States Supreme Court in *Cruzan v Director, Mo. Dept. of Health* (497 US 261, 277, n 6) noted that a number of courts had dealt with the issue of withdrawing artificial nutrition and dehydration, notably, *McConnell v Beverly Enters.—Conn.* (209 Conn 692, 553 A2d 596), *In re Estate of Longeway* (133 Ill 2d 33, 549 NE2d 292), *Conservatorship of Drabick* (200 Cal App 3d 185, 245 Cal Rptr 840, *cert denied* 488 US 958), *Bouvia v Superior Ct.* (179 Cal App 3d 1127, 225 Cal Rptr 297), *Barber v Superior Ct.* (147 Cal App 3d 1006, 195 Cal Rptr 484), *Matter of Westchester County Med. Ctr. (O'Connor)* (72 NY2d 517), *Matter of Conroy* (98 NJ 321, 486 A2d 1209), *Matter of Jobs* (108 NJ 394, 529 A2d 434), *Matter of Peter,* 108 NJ 365, 529 A2d 419), *Gray v Romeo* (697 F Supp 580), *Matter of Gardner* (534 A2d 947 [Me]), *Matter of Grant* (109 Wash 2d 545, 747 P2d 445), *Brophy v New England Sinai Hosp.* (398 Mass 417, 497 NE2d 626), *Corbett v D'Alessandro* (487 So 2d 368 [Fla]), and that all of them permitted, or if the applicable test were met, would permit the termination of such measures based on rights grounded in common law, or in the State or Federal Constitutions.

858), and *Rivers v Katz* (67 NY2d 485, 493 [emphasis added]), in which the Court of Appeals underscored that "a patient's right to determine the course of his medical treatment was paramount to what might otherwise be the doctor's obligation to provide medical care, and that the right of a competent adult to refuse medical treatment must be honored, even though the recommended treatment may be beneficial *or even necessary to preserve the patient's life"* (see generally, Annotation, *Patient's Right to Refuse Treatment Allegedly Necessary to Sustain Life,* 93 ALR3d 67).

A decade ago—seven years before this dispute arose—our State's highest Court held that a health facility was required to respect a patient's right to decline life-saving treatment when the patient becomes incompetent, if there is clear and convincing proof that while competent the patient stated that he or she did not want certain procedures employed under specified circumstances *(Matter of Storar, supra; see also, Matter of Delio v Westchester County Med. Ctr.,* 129 AD2d 1, *supra;* Annas, *Fashion and Freedom: When Artificial Feeding Should be Withdrawn,* 75 Am J Pub Health 685 [June 1985]).

Thus, fidelity to the clearly expressed rights of patients is neither new nor uncertain. Apart from the line of cases from *Schloendorff (supra),* through the time of the dispute and to the present, the Legislature has consistently recognized the basic right of a patient to control the course of his or her medical treatment *(see,* Public Health Law §§ 2504, 2805-d; CPLR 4401-a).[2] Accordingly, there is no basis for distinguishing between patients who are competent and remain so, and those who at the critical hour are no longer competent.

Nor may Grace Plaza, under the circumstances, rightfully contend that it feared criminal liability and was thus put in an untenable dilemma as to whether to discontinue or prolong the feeding. The majority, in discussing the prospect of prosecution, cites our decision in *Matter of Eichner (Fox)* (73 AD2d 431, 450, *mod on other grounds* 52 NY2d 363). I do not read the case law as supporting any viable fear of prosecution in

2. Although it was not in existence at the time of the dispute at bar, we note that the Legislature most recently enacted the health-care proxy law (Public Health Law § 2980 *et seq.,* added by L 1990, ch 752, eff Jan. 18, 1991; 1989 NYS Dept of Health Mem 89-24; *see also,* Swidler, *The Health Care Agent: Protecting the Choices and Interests of Patients Who Lack Capacity,* NYL Sch J of Hum Rts at 1 [fall 1988]; *Life-Sustaining Treatment: Making Decisions and Appointing a Health Care Agent,* New York State Task Force on Life and the Law [July 1987]).

situations such as these. The Court of Appeals spoke to the point when it said in the companion case of *Matter of Storar* (52 NY2d 363, 377, *supra):* "The current law identifies the patient's right to determine the course of his own medical treatment as paramount to what might otherwise be the doctor's obligation to provide needed medical care. A State which imposes civil liability on a doctor if he violates the patient's right cannot also hold him criminally responsible if he respects that right. Thus a doctor cannot be held to have violated his legal or professional responsibilities when he honors the right of a competent adult patient to decline medical treatment". *Matter of Storar (supra)* came down six years before the Elbaum dispute arose.

Given *Matter of Storar (supra),* a claimed threat of prosecution cannot serve as a basis to ignore a patient's wish to expire free of artificial life support. Were that so, every case of life-support prolongation would have to be litigated. The right of self-determination would be subject to the interdiction or the blessing of the local prosecutor. *Matter of Storar (supra)* is clear, and is not ruled by regional idiosyncracy. The court did not invest local prosecutors, each with his or her own outlook, with the power to dictate the law or to destroy the patient's right to let bodily processes take their natural course. Moreover, as we have indicated, comatose patients who have expressed their wishes clearly and convincingly are entitled to the same fidelity to their wishes as patients who are alert at the critical hour *(see, Matter of Delio v Westchester County Med. Ctr., supra).*

In any event, in this case there was no serious threat of prosecution. This is not a case in which a nursing home evinced a desire to discontinue life support and was threatened by a prosecutor. Long before any prosecutorial presence in this case, Grace Plaza stated that it would not discontinue life support and that it had the legal right to so refuse. When in court, Grace Plaza was joined by the District Attorney, not as an adversary, but as a partner in advancing the same position.

### III

#### THE STATE'S INTEREST

Grace Plaza further asserts that there is an underlying State interest in the preservation of life, particularly during what it now asserts to be a period of factual and legal doubt.

As we have seen, however, Grace Plaza did not formulate its position on the basis of any such doubts, but on its own perceived legal and ethical standards. The State's interest does not support Grace Plaza's claim for compensation.

The State's interest is not one-dimensional.[3] New York supports the lives of its citizens, but does not recognize or seek to enforce its interest in prolonging life at all costs, under all circumstances, and to the exclusion of every other considera- tion or interest. As we have observed, there are other valued interests that the State has also adopted, notably, the right of the individual to control the course of his or her own medical treatment. The Court of Appeals pointed out in *Matter of Storar* (52 NY2d 363, 377, *supra)*, that the State Legislature has never enacted a law prohibiting a patient from declining medical treatment or a doctor from honoring the patient's decision, and that the State's interest supports patients' au- tonomy.

In *Matter of Fosmire v Nicoleau* (75 NY2d 218, 227, *supra)*, the Court of Appeals rejected the health provider's proposal that the patient's right to make his or her own life-death decisions be limited to cases in which the patient's condition was terminal and irreversible, and accorded the right to a healthy, treatable patient. Chief Judge Wachtler, speaking for the Court, pointed out that "[t]he right of a patient to decline life-sustaining treatment was recognized in these cases, not because the State considered their lives worthless, but because the State valued the right of the individual to decide what type of treatment he or she should receive under particular circumstances" *(Matter of Fosmire v Nicoleau, supra,* at 229 [emphasis supplied]).

A State interest that has gone so far as to endorse the right

---

3. In the broadest sense, courts have identified four State interests as capable, under certain circumstances, of overriding a patient's common-law right of self-determination. They are (1) the preservation of life, (2) the prevention of suicide, (3) the protection of innocent third parties, and (4) the maintenance of ethical integrity of the medical profession. From existing case law, these interests were "distilled" in *Superintendent of Belchertown State School v Saikewicz* (373 Mass 728, 741, 370 NE2d 417, 425), and have been cited in later decisions *(e.g., Matter of Conroy,* 98 NJ 321, 348-349, 486 A2d 1209, 1223; *Cruzan v Harmon,* 760 SW2d 408, 419 [Mo], *affd Cruzan v Director, Mo. Dept., of Health,* 497 US 261, 279, n 7; *Matter of Colyer,* 99 Wash 2d 114, 121, 660 P2d 738, 743; *Satz v Perlmutter,* 362 So 2d 160, 162, *affd* 379 So 2d 359 [Fla]; *Matter of Delio v Westchester County Med. Ctr.,* 129 AD2d 1, 23; *Matter of Fosmire v Nicoleau,* 144 AD2d 8, 14, *affd* 75 NY2d 218).

of a healthy mother to refuse life-saving treatment should not be denied (or employed against) Jean Elbaum, an adult over 60 years old, who, for an extended period of time, had been in a persistent, irreversible, vegetative state, from which, we found, she expressly sought to be spared.[4] Under the circumstances, therefore, Grace Plaza cannot rightfully align itself with the State's interest or turn that interest against the Elbaums.

The majority stresses that Murray Elbaum entered into the contract for services knowing that the services would include the maintenance of a previously installed feeding tube. In *Elbaum I,* however, we found it significant that Grace Plaza did not tell the Elbaums of its policy against feeding tube removal until after the family requested the removal of the tube. Thus, we found as a fact "the Elbaum family had no reason to believe that Mrs. Elbaum was relinquishing her right of self-determination with regard to her medical care upon her admission to the facility" *(Elbaum v Grace Plaza, supra,* at 256). We also found that Grace Plaza's policy concerning the withdrawal of feeding tubes was put in writing only after the instant action was commenced in June 1988. On this appeal, and in keeping with *Elbaum I,* I would hold that Grace Plaza should not be permitted to invoke the State's interest in sustaining Jean Elbaum's life and thereby gain compensation for doing so, when its services were performed with indifference toward and what we factually determined to be in derogation of the patient's wishes.

IV

#### ETHICAL AND PROFESSIONAL INTERESTS

The remaining interest raised by Grace Plaza is in the professional, ethical realm. It asserts that it is entitled to compensation because it had a legal responsibility to feed and maintain its patient, thus giving rise to its "profound ethical reservations" against withdrawing life support, and the potentially "demoralizing effect that such a death would have on the other residents and the staff of Grace Plaza".

The concern of a medical provider or facility for the morale

---

4. *Matter of Fosmire v Nicoleau* (75 NY2d 218, *supra)* was decided after the Elbaum dispute was before the Supreme Court, but it reflects consistent adherence by the Court of Appeals to the proposition that the State's interests include not only the preservation of life, but the autonomy of the patient, when clearly and convincingly expressed.

of its patients and personnel is undeniable, as is the interest in promoting the highest levels of medical professionalism. The two go hand-in-hand. The advancement of professional ethics to support the preservation of life has epitomized the medical profession, to the public benefit. However powerful those interests may be, they should not serve as a platform to afford compensation for unwanted services, rendered adversely to the patient's declared right of autonomy. That priority has long been at the core of the law of this State, and its declarations that a patient's right to determine the course of his or her medical treatment is paramount to what might otherwise be a doctor's duty to provide care or preserve life *(see, Rivers v Katz,* 67 NY2d 485, 493, *supra; Matter of Storar, supra,* at 377; *see also,* Bedell, Delbanco, *Choices About Cardiopulmonary Resuscitation in the Hospital: When do Physicians Talk With Patients?,* 310 New Eng J Med 1089 [Apr. 1984] [advocating expanded communication relative to the patients' choices]).

Nor can I accept Grace Plaza's contentions as to patient and staff morale as a basis to override Jean Elbaum's wishes. The prospect of an indefinite, hopeless, vegetative existence, and the anguish that it causes family members, loved ones, friends, and potential patients, has a profoundly demoralizing effect of its own *(see,* Cantor, *A Patient's Decision to Decline Life-Saving Medical Treatment: Bodily Integrity Versus the Preservation of Life,* 26 Rutgers L Rev 228, 249, 250 [1973]; Chapman, *The Uniform Rights of the Terminally Ill Act: Too Little, Too Late?,* 42 Ark L Rev 319, 336 [1989]).

V

JUDICIAL RECOURSE

Grace Plaza also argues that it persisted in administering life support, having no burden to seek judicial intervention. Grace Plaza claims that the patient or the family must initiate the litigation.

As the *Storar* Court explained, however, a facility in a quandary as to cessation of life supports may seek a court ruling *(Matter of Storar, supra,* at 382). Thus, a facility can resolve doubts, if it genuinely has them and if it wants to resolve them, in a court of law. While *Storar* does not place the sole obligation on the facility to go to court and to take the initiative in every instance, it certainly does not place the burden (as Grace Plaza would place it) on patients and families to bring lawsuits to vindicate the right to self-determina-

tion. If facilities adopted the recalcitrant position that Grace Plaza did, it would, even without the participation of local prosecutors, require every family or patient to initiate suit in order to assert the wishes of the patient. Grace Plaza's position would compel patients and their families to wage courtroom combat as endless as the medical expenses to which such patients and families would be put, in seeking to overcome rigid or unyielding attitudes on the part of providers *(see,* Rhoden, *Litigating Life and Death,* 102 Harv L Rev 375, 379 [1988]; *see also,* Kapp, *Enforcing Patient Preferences: Linking Payment for Medical Care to Informed Consent,* 261 JAMA 1935 [1989]). It would not bring about the type of cooperation that such circumstances warrant. Significantly, Grace Plaza did not go to court to gain judicial approval to ascertain or weigh, let alone honor the wishes of the patient. Its position was adversarial throughout. Grace Plaza sought not guidance, but only a fee and a ruling authorizing it to prolong Jean Elbaum's life by artificial means for as long as she remained at Grace Plaza, even to the extent of seeking a stay of our ruling in *Elbaum I* so that it could appeal further. Thus, under scrutiny, there is an emptiness to Grace Plaza's contention that its fee action was simply another way of asking the court for guidance. I believe that Grace Plaza is not entitled to the fee it now seeks.

However, I agree with the Supreme Court that the doctrine of claim preclusion bars the defendant from proceeding with the counterclaims, and I therefore do not address the battery issue. Accordingly, I vote to affirm the order insofar as appealed and cross-appealed from.

MANGANO, P. J., and LAWRENCE, J., concur with BRACKEN, J.; ROSENBLATT, J., dissents in a separate opinion.

Ordered that the order is reversed insofar as appealed from, on the law, the provision of a prior order entered June 16, 1989, denying that branch of the defendant's cross motion which was for summary judgment dismissing the complaint, is reinstated, the plaintiff is granted partial summary judgment as to liability for services rendered to Jean Elbaum, and the matter is remitted to the Supreme Court, Nassau County, for an assessment of damages; and it is further,

Ordered that the order is affirmed insofar as cross-appealed from; and it is further,

Ordered that the plaintiff is awarded one bill of costs.